**HARVARD PILGRIM HEALTH CARE OF NEW ENGLAND, INC., In Liquidation**

v.

**John GELATI,[1] in his capacity as Acting Tax Assessor of the City of Providence.**

**Nos. 2003–197–Appeal, 2003–229–Appeal.**

Supreme Court of Rhode Island.

Dec. 17, 2004.

1. Thomas Rossi, Tax Assessor for the City of Providence, was the named defendant. He since has vacated the office. John Gelati is the Acting Tax Assessor. The caption has been changed to reflect the current administration.

———

Richard Welch, Providence, for Plaintiff.

Caroline Cornwell, Providence, for Defendant.

Before WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

PER CURIAM.

This is another in a series of tax appeals involving the plaintiff, Harvard Pilgrim Health Care (Harvard Pilgrim or plaintiff). In this case, Harvard Pilgrim challenges three Superior Court judgments upholding the City of Providence's (city) tangible personal property assessments for the tax years 1997, 1998, and 1999. This appeal came before the Supreme Court for oral argument on September 29, 2004, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and proceed to decide the appeal at this time. For the reasons indicated herein, we affirm in part and reverse in part.

## I

### Facts and Travel

The procedural background of this case was well stated in our earlier decision:

"After unsuccessfully appealing assessments to the Providence Board of Tax Assessment Review, Harvard Pilgrim filed four separate actions in Superior Court alleging that the city valued its ratable personal property for tax years 1997, 1998, 1999, and 2000, respectively, in excess of fair market value in violation of G.L.1956 § 44–5–12. The four actions were consolidated for trial and heard before a trial justice without the intervention of a jury. After several days of hearings and the submission of post-trial memoranda, the trial justice found in favor of the city for three of the years [1997–1999], and held in favor of Harvard Pilgrim for tax year 2000." *Harvard Pilgrim Health Care of New England, Inc. v. Rossi,* 847 A.2d 286, 288 (R.I.2004) (*Harvard Pilgrim I*).[2]

### A

### Full and Fair Cash Value & The City's Formula

Of central concern to the case is Harvard Pilgrim's assertion that the Superior Court erred in affirming the city's assessments of its ratable tangible personal property for tax years 1997, 1998, and 1999 in excess of full and fair cash value, violating G.L.1956 § 44–5–12. Section 44–5–12(a) provides that: "[a]ll property subject to taxation shall be assessed at its full and fair cash value or at a uniform percentage of its value, not to exceed one hundred percent (100%) to be determined by the assessors in each town or city * * *."[3]

Thomas Rossi (Rossi), then the city's tax assessor and the named defendant, testi-

---

**2.** In *Harvard Pilgrim Health Care of New England, Inc. v. Rossi,* 847 A.2d 286 (R.I.2004), we affirmed the Superior Court judgment in favor of Harvard Pilgrim for the 2000 tax year.

**3.** The city valued Harvard Pilgrim's tangible personal property for the 1997 tax year at $5,849,100, with a tax assessment of $449,094. For 1998, the city's valuation was $6,570,700, with a tax assessment of $504,498. The 1999 valuation was

fied that "the formula the city used to establish fair market value for items of tangible personal property was 'acquisition cost minus depreciation.'" *Harvard Pilgrim I*, 847 A.2d at 289.

Rossi testified that the city assessors supplied a form on which property owners could list their ratable tangible personal property—although property owners are free to submit their annual "account" in any form that meets the statutory requirements of a "true and exact account of all ratable estate owned or possessed." Section 44–5–15. Taxpayers are asked to state the acquisition cost of listed items, the date of purchase, and whether the items were new or used at the time of purchase. Sections of the city's form pertinent to Harvard Pilgrim's accounts include: section two, tangible personal property; section three, computer equipment; section four, inventory/stock in trade/supplies; section five, tangible property leased or rented from others; and section six, leasehold improvements. While sections two and six include spaces for the taxpayer to declare fair market value, section three has no such space. Rossi testified that the city relied solely on the taxpayer's listed acquisition costs, ignoring taxpayer statements of fair market value; Roberta Vellucci D'Onofrio, supervisor of personal property in the assessor's office, also testified to that effect.

Rossi testified that the city applies depreciation schedules for furniture and equipment, computers, and leasehold improvements to arrive at a property valuation. Rossi reviewed the depreciation schedules for the tax years 1997–2000 in detail. He testified that he used the Marshall Swift Evaluation Service (or Marshall Swift Manual), a nationally used tool in the appraisal industry, as a guide to set depreciation schedules. The Marshall Swift Manual, in turn, is based on an Internal Revenue Service publication, as well as various studies of equipment and bookkeeping practices and appraiser's opinions.

For the 1997 and 1998 tax years, Rossi testified the city's depreciation schedules included a ten-year schedule for furniture, fixtures and equipment, a seven-year schedule for computers, and any of three different types of depreciation for leasehold improvements. The individual depreciation schedules, again derived from the Marshall Swift Manual, included varying percentage depreciations deducted from the acquisition cost of each item, depending on its age. For the tax years 1997 and 1998, the depreciation schedules started with a 5 percent deduction for assets in their first year, with a 10 percent decrease every year until the ninth year, when depreciation bottomed out at 20 percent. In the city's view, so long as an item has some use—no matter its age—it has taxable value.

Rossi testified that the only change to the depreciation schedules between the 1997 and 1998 tax years was the inclusion of depreciation for items purchased during the 1997 calendar year. However, for the 1999 tax year, the city adopted new depreciation schedules that became applicable to Harvard Pilgrim's personal property. The new schedules, for furniture, fixtures and equipment, as well as computers, adopted a 100 percent value (zero depreciation) for the first year of use.[4] He testified that

$9,375,910, with a tax assessment of $752,510.54.

4. For furniture, fixtures and equipment, the 1999 depreciation schedules were as follows: year one, 100 percent; year two, 95 percent; year three, 90 percent; year four, 80 percent; year five, 70 percent; year six, 60 percent; year seven, 50 percent; year eight, 40 percent; year nine and beyond, 30 percent. For computers, the seven-year depreciation schedule began at 100% in the first year and

under the new schedule, furniture, fixtures, and equipment bottomed out at a 30 percent valuation, as opposed to 20 percent in previous years. Rossi stated that in his opinion, "the fair market values would be best reflected using 100 percent in those first years." When asked whether use of the depreciation schedules resulted in the fair market value of Harvard Pilgrim's listed assets for the years in question, Rossi replied affirmatively. On cross-examination, however, he admitted that the city's depreciation schedules did not specifically account for physical depreciation, functional obsolescence, or economic/external obsolescence. Rossi did not specifically rely on market data for secondhand computers in valuing computer depreciation, as did Harvard Pilgrim's appraiser. Further, Rossi noted that the city's figures for acquisition costs could properly include shipping, freight, and labor, another practice that Harvard Pilgrim disputed. Rossi repeatedly stated that the assessor must determine fair market value for the personal property of more than 7,000 taxpayers—with an overall number of items requiring assessment in the hundreds of thousands—characterizing the task as "impossible" and "difficult."

The city's witness, Thomas J. Sullivan (Sullivan), a CPA and consultant specializing in tax and health care, testified that the city's inclusion of what he called "soft costs," such as freight, shipping, and installation, were properly included as acquisition costs under "Generally Accepted Accounting Principles" (GAAP). He also said that the city's seven-year depreciation schedules for computers did not match GAAP, which applies a five-year schedule. On cross-examination, Sullivan said that from an accountant's viewpoint (not as an appraiser), the city's method of depreciation fails to reach fair market value.

dropped 15 percent for each year in the sev-

Nonetheless, he clarified that the formula, if uniformly applied to all city taxpayers, would share the tax burden equally.

Two witnesses for Harvard Pilgrim addressed the city's "acquisition cost minus depreciation" formula. John McEachern (McEachern), an appraiser, testified that he had never seen a depreciation system that followed the city's 100 percent first-year value for computers, furniture, or fixtures. Harvard Pilgrim's Accountant, George Moses (Moses), of Ernst & Young, an economist and former Boston assessor, also testified that the city's depreciation schedules for computers differed substantially from twenty-five other jurisdictions.

The trial justice concluded that the city's formula for reaching fair market value was not an illegal method of assessment. The Superior Court noted that Harvard Pilgrim's arguments in this respect were premised merely on a disagreement about methodologies for calculating full and fair cash value, while ignoring the important disjunctive in § 44–5–12. The trial justice said that "the statute requires uniformity in assessment of the method employed as long as it is even-handedly applied and Harvard Pilgrim introduced no evidence that it was not."

## B

### Harvard Pilgrim's Annual Filings

Harvard Pilgrim timely filed its annual "account" filings with the city assessor for 1997–1999. Along with the city's form discussed above, Harvard Pilgrim provided a detailed "net book value" report listing approximately 9,000 assets, their date of purchase, and depreciation. On May 14, 1997, however, Moses notified the city assessors that Harvard Pilgrim had inaccurately reported its tangible personal prop-

en-year schedule.

erty, and filed an amended return. In the amended return, Moses explained that Harvard Pilgrim had included assets that had been disposed in its report. The amended return also contended that labor, freight, and installation costs had been included improperly in Harvard Pilgrim's original filing.

Based on these inaccuracies, Moses hired Norman Levy & Associates, an inventory specialist company, to help Harvard Pilgrim identify and appraise its assets. McEachern, an appraiser with Norman Levy & Associates, was in charge of the Harvard Pilgrim appraisal project. McEachern subsequently completed an appraisal report, dated August 12, 1998. The appraisal purported to identify each asset and assign a fair market value based on comparable sales of similar personal property. The report included retroactive valuations of Harvard Pilgrim's property covering the 1997 and 1998 taxes (assessed as of December 31, 1996, and December 31, 1997, respectively). McEachern's appraisal resulted in figures that were significantly lower than the city had used for 1997 and 1998: $2,210,725 and $1,842,070, respectively—considerably below the city's original valuations of $5,849,100 and $6,570,700 for the same years.

When reviewing his report at trial, McEachern testified that his professional experience as an appraiser enabled him to "look at an asset, and if appropriate, reasonably estimate its value as far back as two and a half years prior to inspection." Asked how he could do so, McEachern responded: "Sir, I'm an appraiser. My experience tells me that when I'm looking at a property today, given reasonable assumptions, I can estimate its condition in 1997, December 31, 1997." Further pressed on cross-examination, McEachern could not reconcile how new property ac-

quisitions reported at approximately $6 million during the three-year period between 1995 and 1998 ended up with an appraised value of $1.2 million. McEachern also testified to errors in Harvard Pilgrim's reporting; line items in Harvard Pilgrim's "net book value" records included some non-assessable items, such as software and deleted items that no longer were on site.

The city asserted that McEachern's August 1998 appraisal report was inadmissible because its valuation methodology was not included in Harvard Pilgrim's 1997 and 1998 filings. They asserted that the report was not submitted until Harvard Pilgrim's appeal to the Board of Tax Assessment Review for its 2000 taxes—well after the statutory March 15th account filing deadlines. The trial justice admitted the report into evidence over the city's objection.

Harvard Pilgrim's final witness was Jeffrey Lieberman (Lieberman), the project director in charge of managing Harvard Pilgrim's liquidation. Lieberman confirmed the figures used as the basis for McEachern's 1998 appraisal report. Lieberman also reviewed Harvard Pilgrim's adjusted property valuations. Lieberman explained that Harvard Pilgrim's adjusted fair market values relied on the McEachern report as well as various other adjustments.

C

The 1997 and 1998 Tax Year

After a bench trial, the trial justice issued a decision denying Harvard Pilgrim's appeals for the years now in question, and ruling that the city had overassessed Harvard Pilgrim for the 2000 tax year. With respect to the 1997 and 1998 appeals, the trial justice noted his skepticism of McEachern's ability to appraise retroac-

tively based on professional experience, stating that it "introduces too much speculation into the process." The trial justice further noted his skepticism of the probative value of such an expert opinion, especially as the bedrock of Harvard Pilgrim's 1997 and 1998 appeals.

In addition, the trial justice referred to Harvard Pilgrim's failure to report accurately both the value and identity of its assets, stating that "Harvard Pilgrim did not have either sufficient knowledge of what tangible assets it had on its premises or an understanding of what factors went into their evaluation."

### D

### The 1999 Tax Year

Harvard Pilgrim timely filed its 1999 annual account with the city assessor, postmarked January 29, 1999. On October 25, 1999, Harvard Pilgrim was placed in rehabilitation pursuant to the Insurers' Rehabilitation and Liquidation Act, G.L. 1956, chapter 14.3 of title 27 (IRLA). Later, in January of 2000, Harvard Pilgrim went into liquidation status under the IRLA. In May 2000, the city tax assessor upheld Harvard Pilgrim's original 1999 assessment.

The plaintiff did not file its appeal of the tax assessor's May 2000 decision until January 26, 2001. Accordingly, Harvard Pilgrim did not timely appeal the city assessor's decision to the board of tax assessment review, as required by § 44-5-26(a) (requiring such appeals to be filed within thirty days). Nonetheless, Harvard Pilgrim argued that the IRLA, governing its rehabilitation and liquidation, cured its untimely appeal.

The trial justice ultimately rejected Harvard Pilgrim's 1999 appeal. His decision was based entirely on his interpretation of the IRLA provision, finding that the provision applied only to cases in which the liquidator or rehabilitator initiates an entirely new action, as opposed to the next phase in a continuing dispute.

### II

### Discussion

 We begin our discussion with a reiteration of the established principles of appellate review. The standard for reviewing the findings of a trial justice sitting without the intervention of a jury is extremely deferential. *Granoff Realty II, Limited Partnership v. Rossi,* 823 A.2d 296, 298 (R.I.2003). This Court will overturn the findings of a trial justice sitting without a jury only "when the justice misconceives or overlooks material evidence or otherwise is clearly wrong." *Id.* "[W]ith respect to the credibility of the witnesses, it is the trial justice who has the opportunity to observe the witnesses as they testify and therefore is in a better position to weigh the evidence and to pass upon the credibility of the witnesses than is this court." *Lembo v. Lembo,* 677 A.2d 414, 417 (R.I.1996). With these principles in mind, we begin with a review of Harvard Pilgrim's claims concerning its 1997 and 1998 taxes.

### A

### 1997 and 1998

 Harvard Pilgrim's overriding allegation on appeal is that the city assessed its tangible personal property in excess of fair market value, violating § 44-5-12.[5] Section 44-5-12(a) provides that "[a]ll

---

5. Harvard Pilgrim does not allege that the city's formula for property valuation, "acquisition cost minus depreciation," as applied with the city's depreciation schedules, is in itself an illegal method of assessment.

property subject to taxation shall be assessed at its full and fair cash value, or at a uniform percentage of its value, not to exceed one hundred percent (100%), to be determined by the assessors in each town or city * * *." We have defined " 'full and fair cash value' as fair market value." *Nos Limited Partnership v. Booth*, 654 A.2d 308, 310 (R.I.1995). We explained that "fair-market value" means "that price the property would probably bring in a transaction in a fair market between a willing seller and a willing buyer." *Ferland Corp. v. Bouchard*, 626 A.2d 210, 215 (R.I.1993) (quoting *Rosen v. Restrepo*, 119 R.I. 398, 400, 380 A.2d 960, 961 (1977)).

The assessor, in determining fair market value, "is not bound by any particular formula, rule or method * * * to ascertain the fair market value of real estate." *Ferland Corp.*, 626 A.2d at 215 (quoting *Kargman v. Jacobs*, 113 R.I. 696, 704, 325 A.2d 543, 547–48 (1974) (*Kargman I*)). The choice of a particular method is a discretionary act authorized by our state constitution and delegated by the General Assembly to our state's various municipal assessors. *Rosen*, 119 R.I. at 401, 380 A.2d at 961. "[T]ax assessors are entitled to a presumption that they have performed their acts properly until the contrary is proven." *Harvard Pilgrim I*, 847 A.2d at 292 (quoting *Willow Street Associates LLP v. Board of Tax Assessment Review*, 798 A.2d 896, 899–900 (R.I.2002)). The taxpayer in a tax assessment challenge bears the burden of proving that the assessor's valuation exceeds fair market value. *Id.* "If the taxpayer * * * claims that the assessor used an inappropriate fair market value * * * the burden will be on the taxpayer to present evidence of fair market value." *Nos Limited Partnership*, 654 A.2d at 310. The fact-finder "can accept the property valuation of one set of experts and reject that of another set of

experts * * *." *Kargman v. Jacobs*, 122 R.I. 720, 735, 411 A.2d 1326, 1334 (1980) (*Kargman II*); *Socony–Vacuum Oil Co. v. French*, 88 R.I. 6, 11–12, 143 A.2d 318, 321 (1958). "Just as a trial justice may pick and choose among evidence presented by laypersons, he or she may do the same when dealing with evidence of experts." *Ferland Corp.*, 626 A.2d at 216.

As noted above, the trial justice ruled in favor of the city for the 1997 and 1998 appeals. We first address the trial justice's comments concerning fault and his reluctance to reward Harvard Pilgrim's mismanagement. The trial justice said that "Harvard Pilgrim's institutional systems failures in this regard ought not to allow it to challenge the city's valuation and assessments under the guise that its errors in accurate reporting were 'inadvertent.' "

We have said in the past that the "valuations of properties for local taxation cannot vary with the managerial successes or failure[s] of the owners." *Kargman I*, 113 R.I. at 706, 325 A.2d at 548. In *Wickes Asset Management, Inc. v. Dupuis*, 679 A.2d 314, 322 (R.I.1996), we remanded the case for reconsideration when the trial justice improperly considered the plaintiff's waste of its assets because it was "irrelevant in the tax assessment analysis and should not be weighed." We think the rule in *Wickes* applies with equal force here. To the extent that Harvard Pilgrim can prove the fair market value of its assets at trial, plaintiff's mismanagement should not bear on whether its burden of proof has been met.

We also note that retroactive appraisal is not too "speculative," in and of itself, to be the basis of a tax assessment appeal. Indeed, our local taxation statute sets out a specific procedure for the assessment of back taxes when a property has been omitted, escaped taxation, or been otherwise

illegally or erroneously assessed. Section 44–5–23 provides:

> "If any real estate liable to taxation in any city or town has been omitted in the assessment of any year or years and has thereby escaped taxation, or if any tax has been erroneously or illegally assessed upon any real estate liable to taxation * * *, the assessor of taxes of the city or town in the next annual assessment of taxes after the omission * * * is known to him or her shall assess or reassess * * * to the same amount to which the real estate ought to have been assessed in the year or years. The assessment is in addition to any assessment of taxes against the person or persons for the then current year, and shall be placed on a special tax roll and annexed to the general tax roll for the current year; provided, that the assessment or reassessment is made within six (6) years * * *."

Accordingly, retroactive appraisal can properly form the basis of a tax assessment appeal.

Notwithstanding the lower court's misplaced emphasis on these issues, we still must review the trial justice's decision through the extremely deferential lens of appellate review. Harvard Pilgrim's burden in this case required more than discrediting the city's depreciation scheme, or the admission by one of its witnesses that the formula did not reflect precise fair market value. The plaintiff also had to prove the fair market value of its own property. *Harvard Pilgrim I,* 847 A.2d at 292 ("The taxpayer has the burden of proof to establish that the assessor has set a value on the subject properly that exceeds fair market value."); *Nos Limited Partnership,* 654 A.2d at 310 (stating that a taxpayer claiming overassessment has the burden of presenting evidence of fair market value). It is in so doing that its appeal for 1998 and 1999 met its demise. The court below found Harvard Pilgrim's retroactive evaluation "speculative" because of the appraiser's statement that he could look at an asset and, based on his experience, estimate its physical condition at various points in time going back two and a half years. No more explanation was provided as a basis for the retroactive valuations—simply "experience."

In *Kargman I,* 113 R.I. at 703, 325 A.2d at 547, we affirmed the decision of a trial justice to discount a similar "bald reference" to experience. There, in a debate about what formula to use for tax valuation purposes, the plaintiff's expert simply based his contention about the proper formula on his "experience" and "judgment." *Id.* As we stated, the "lack of specificity pertaining to the experience upon which the expert's judgment rested caused the trial justice to give no weight to this expert's opinion." *Id.* Given that the burden is on Harvard Pilgrim to establish that the city has set a value on its property that is greater than its fair market value, we see no reason to disturb the lower court's ruling.

In its next assertion of error, Harvard Pilgrim alleges that the trial court committed reversible error by failing to consider the McEachern appraisal report and trial testimony as an "amendment" to its annual returns for 1997 and 1998. This assertion need not detain us long—it is nothing more than Harvard Pilgrim's previous arguments dressed up in new clothes. The McEachern report *was* admitted into evidence. The trial court *did* allow Harvard Pilgrim's witnesses to testify *at length* about the report, its contents, and their purported impact on the fair market value of the property reviewed in the case. The lower court merely found Harvard Pilgrim's testimony unpersuasive.[6]

---

**6.** In addition, Harvard Pilgrim argues that no evidentiary or statutory prohibition exists re-

## B

### 1999

■■■■ Harvard Pilgrim next alleges that the Superior Court erred in concluding that certain tolling provisions of the Insurers' Rehabilitation and Liquidation Act, § 27–14.3–19 and § 27–14.3–28, did not cure Harvard Pilgrim's untimely appeal to the Board of Tax Assessment Review. The question is solely one of statutory construction, which this Court reviews *de novo. Harvard Pilgrim I*, 847 A.2d at 290. When the language of a statute is clear and unambiguous, we must enforce the statute as written by giving the words of the statute their plain and ordinary meaning. *Id.* But when the statute is ambiguous, we must apply the rules of statutory construction and examine the statute in its entirety to determine the intent and purpose of the Legislature. *Id.*

Section 27–14.3–19 provides a one-year toll (at a minimum) for statutes of limitation when an insurer is in rehabilitation. Section 27–14.3–19(b) provides:

> "The rehabilitator may, upon an order for rehabilitation, within one year or other longer time as applicable law may permit, institute an action or proceeding on behalf of the insurer upon any cause of action against which the period of limitation fixed by applicable law has not expired at the time of the filing of the petition upon which the order is entered."

A parallel provision, § 27–14.3–28, provides a two-year toll (at a minimum) when an insurer is in liquidation. Section 27–14.3–28(b) states:

> "The liquidator may, upon or after an order for liquidation, within two (2) years or a longer time as applicable law may permit, institute an action or proceeding on behalf of the estate of the insurer upon any cause of action against which the period of limitation fixed by applicable law has not expired at the

stricting it from introducing additional or amended information about its ratable assets or fair market value after the filing deadline. Our decision in *Harvard Pilgrim I* answered this question. There, we affirmed the trial justice's conclusion that in the 2000 tax year the city assessed Harvard Pilgrim's personal property in excess of fair market value, in part, *based on testimony taken at trial in November 2001. See Harvard Pilgrim I*, 847 A.2d at 292–94.

We pause to note the deficiency in legislative draftsmanship exhibited in G.L. § 44–5–26. We agree, in principle, with the city's point that allowing new evidence to come in at trial undermines the important policy of promptly finalizing local tax rolls. *See Northgate Associates v. Shorey*, 541 A.2d 1192, 1193 (R.I.1988) (noting the municipality's "concern that disputes relative to an assessment be resolved as expeditiously as possible so that the tax roll may be finalized and the tax rate established"). However, plaintiff is correct in asserting that no statutory or evidentiary provision prohibited introduction—even as late as the Superior Court trial—of

evidence about the fair market value of its ratable property. Our decision in *Harvard Pilgrim I*, rested, in part, on the statute's deficiencies in this respect. The only restriction on amending taxpayer returns appears not in the statutory text, but in the fine print of a form that is appended to the statute, entitled "Application for Appeal of Property Tax." Under the subheading "Filing An Account," the form instructs that: "No amended returns will be accepted after March 15th." Section 44–5–26(b) (form).

Equally perplexing is the fact that § 44–5–26 is entitled "Petition in [S]uperior [C]ourt for relief from assessment" but does not mention the procedure or timeline for appeals to the Superior Court. It is not our place to amend the statute to repair these defects. Likewise, we cannot hold plaintiff to an account amendment timeline that does not exist in the statutory text and is mentioned only in the fine print of an appended form. Given the importance of timeliness in the tax assessment and levy process, we suggest that the legislature expeditiously address these statutory flaws.

time of the filing of the petition upon which the order is entered."

If these provisions applied to Harvard Pilgrim, its appeal would be timely. The plaintiff appealed to the tax board on January 26, 2001, less than two years after its liquidation order entered on January 10, 2000, and within one year of the assessor's decision in May 2000 upholding the assessment.

Before the Superior Court, the city argued that Harvard Pilgrim's appeal was an administrative appeal, not a "cause of action," and, thus, outside the statute. The city further argued that "institute" modified "action or proceeding" and, therefore, the law only applies to newly commenced actions—not the appeal of an existing one. Ultimately, the city's argument that "institute" is the operative word persuaded the court below. Referring to our decision in *Northgate Associates v. Shorey*, 541 A.2d 1192, 1193 (R.I.1988), the trial justice added a plausible policy analysis of his own, by noting that the Legislature provided a short appeal period to ensure that tax disputes are resolved expeditiously so that tax rolls may be finalized. *Id.* at 1193.

We conclude otherwise. At the outset we note that the court's emphasis on "cause of action" ignores the "or proceeding" that is equally a part of both sections cited above. Black's Law Dictionary informs us that the term, "action,"

> " 'has been defined to be an ordinary proceeding in a court of justice, by which one party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense. * * * More accurately, it is defined to be any judicial proceeding, which, if conducted to a determination, will result in a judgment or decree.' " Black's Law Dictionary 31 (8th ed. 1999).

The same dictionary defines the term "proceeding" much more broadly, to include "[a]n act or step that is part of a larger action." *Id.* at 1241. Significantly, Black's notes that " '[a]s applied to actions, the term proceeding may include * * * the taking of the appeal or writ of error.' " *Id.* (quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3–4 (2d ed. 1899)).

Given that the term "action" is subsumed within the definition of "proceeding" but not vice versa, the meaning of the phrase "institute an action or proceeding" is ambiguous. *See id.* at 88 (defining ambiguity as "[a]n uncertainty of meaning or intention, as in a contractual term or statutory provision"). *Cf. W.P. Associates v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I.1994) (stating that "an agreement is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation").

In view of this ambiguity, we proceed to examine the statute in its entirety pursuant to our rules of statutory construction. *Harvard Pilgrim I*, 847 A.2d at 290. We are mindful that our interpretation should "not construe [the] statute to reach an absurd or unintended result." *Hargreaves v. Jack*, 750 A.2d 430, 435 (R.I.2000) (quoting *Kaya v. Partington*, 681 A.2d 256, 261 (R.I.1996)). Stepping back from the lower court's overly narrow focus on individual passages, we note that the purpose of these provisions appears to be protecting insurance companies teetering on the brink of insolvency from a feeding frenzy of litigation. The first section of both provisions bars all future and continuing litigation. *See* § 27–14.3–19(a) ("Any court in this state before which any action or proceeding in which the insurer is a party, or is obligated to defend a party, is pending when a rehabilitation order against the insurer is entered shall stay the action."); § 27–14.3–28(a) ("Upon the

issuance of an order appointing a liquidator of a domestic insurer * * * no action at law or equity or in arbitration shall be brought against the insurer or liquidator * * * nor shall any existing actions be maintained or further presented after the issuance of the order."). Along similar lines, the second section of the provisions extends the time for the failing insurance company to pursue its own claims, especially after liquidation has commenced. *See* § 27–14.3–19(b) (giving the insurer in rehabilitation a year to pursue "action[s] or proceeding[s]"); § 27–14.3–28(b) (providing a two-year window for the liquidating insurance company's "action[s] or proceeding[s]" that were not barred when liquidation began).

The rule against unintended or absurd constructions has application here. The lower court's interpretation would mean that a failing insurer, while temporarily protected and provided an extra window to improve its financial condition by pursuing *new claims,* would be barred from pursuing other lucrative claims solely because they are in successive stages of *older litigation.* To agree with the lower court's interpretation would lead to an absurd result. Accordingly, we hold that an appeal to the local tax board of review is within the meaning of "action or proceeding" under § 27–14.3–19 and § 27–14.3–28. "[A]ction or proceeding" need not be limited to new litigation. Because the trial court made no substantive findings or conclusions beyond the statute of limitations issue, we remand the record to the Superior Court for further proceedings on Harvard Pilgrim's 1999 assessment.

Finally, we address several of the city's arguments that are likely to arise in conjunction with our remand of the 1999 assessments. First, the city argues that Harvard Pilgrim failed to provide an adequate account—specifically, by not including fair market value on the city's form—and thus is barred from pursuing a claim of overassessment. Our decision in *Harvard Pilgrim I,* 847 A.2d at 291, addressed and dismissed this claim as "specious." In their form, plaintiff's 1999 account submissions do not vary materially from those of 2000, which we held sufficient for statutory appeal purposes. We stated: "Harvard Pilgrim *did* file a 'true and exact account * * * describing and specifying the value' of all its ratable personal estate sufficient to invoke the statutory appeal process." *Id.* (emphasis added). This Court has only required strict compliance with the statute with respect to two specific statutory directives: (1) "that an account [must] be submitted[;]" and (2) "that [such] an account [must] be notarized." *Id.* at 290. Beyond that, "the legislative intent is to require such sufficiency in the description of the personal property as to be of assistance to the assessor in assessing a tax against each item." *Id.* at 291. Lastly, the city argues that there is no statutory authority for Harvard Pilgrim to amend its account. On this point we refer to our discussion of this point above. *See* discussion *supra* note 6.

## Conclusion

For the aforementioned reasons, we affirm in part and reverse in part the judgment of the Superior Court. We affirm the portion of the judgment upholding the 1997 and 1998 tax assessments. We reverse the Superior Court's judgment affirming the Tax Assessor's decision for the city with respect to the 1999 assessments. The record shall be remanded to the Superior Court to consider Harvard Pilgrim's 1999 claims based on the evidence adduced at trial.