Kathleen C. VICARIO

v.

Paul Michael VICARIO.

No. 2005–244–Appeal.

Supreme Court of Rhode Island.

June 29, 2006.

Jerry L. McIntyre, Esq., Providence, for Plaintiff.

Donald R. Lembo, Esq., North Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

The defendant, Paul Michael Vicario, appeals from a Family Court order granting

an absolute divorce to him and the plaintiff, Kathleen C. Vicario, and distributing their assets. The defendant contends that the general magistrate erred in: (1) rejecting the opinion of his expert witness concerning the value of one of his businesses; (2) awarding the plaintiff 60 percent of the marital estate; (3) awarding the plaintiff rehabilitative alimony; and (4) sanctioning him $10,000 for failing to comply with court orders concerning the discovery of certain financial documents. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be decided summarily. After considering the written and oral submissions of the parties and examining the record, we are of the opinion that the issues raised in this appeal may be resolved without further briefing or argument. For the reasons set forth herein, we affirm the order of the Family Court.

### Facts and Procedural History

Kathleen and Paul were married on November 1, 1987, and they have two children. After approximately fourteen years of marriage, the parties separated around September 2001. Kathleen filed a complaint for divorce on September 25, 2001, and Paul filed an answer and counterclaim on December 7, 2001. Each party cited irreconcilable differences that caused the irremediable breakdown of the marriage as the ground for divorce. The general magistrate of the Family Court heard the matter on various dates from March 26, 2003, to June 1, 2004, during which hearings the following facts were revealed.

Kathleen testified that she was employed as an assistant manager for a clothing store when the couple wed, making about $12,000 to $15,000 annually. She said that she and her husband agreed that she would not work after their first son was born, and that she did not work throughout the remainder of the marriage until they separated. During the marriage, the couple had a joint checking account containing money that Kathleen could utilize. She said that her husband would give her about $500 per week to pay bills and buy food, but that there was one point when she asked her father for financial assistance because Paul was not providing adequate funds and she was receiving notices from creditors that bills were not paid.

Kathleen testified that although the entire family would vacation together at the beginning of the marriage, later she would go with the children and without Paul because he always had to work. She said that the couple argued about whether their sons would play sports and that Paul occasionally would belittle her in front of the children. Kathleen said that at the time of trial, she was forty-five years old, in good health, and pursuing a degree in advertising at the Rhode Island School of Design. She purchased her own home in Barrington in May 2003, where she and her sons were living at the time of trial. Paul advanced $70,000 to Kathleen for the down payment on the house.

Kathleen further testified that during the course of the marriage, there always were problems when she asked her husband for money to buy furniture or plan vacations. She said that there was never enough money to pay for the children's clothes, tutors, or renovating the house, and that her parents and Paul's parents had to help pay for such expenses. She alleged, however, that Paul purchased expensive clothing for himself through his business and also made other costly purchases without her knowledge. Kathleen indicated that during the marriage, she was the primary caretaker for the children and the home while her husband worked.

She attended business functions with her husband and socialized with his friends. However, by the end of the marriage, she said, she wanted a divorce because Paul ignored her, refused to communicate, was uncooperative and secretive, and did not share. She testified that she asked her husband to accompany her to counseling, but that he claimed that she, not he, was the one with the problem.

Paul, a certified public accountant, testified that he was the sole shareholder of an accounting business, Leonelli and Vicario, Ltd. He and his wife owned the real estate where the business was located, at 240 Chestnut Street in Warwick. Paul also said that he held a 50 percent interest in Abacus Benefit Consultants, Inc. (Abacus), an actuarial consulting business in Cranston. Abacus was located in a building owned by ABAX, LLC, another business in which Paul held a 50 percent interest. He testified that his accounting business grossed approximately $700,000 in 2001 and 2002 and that Abacus grossed about $1 million in 2001. Paul said that he did not receive a yearly salary from Abacus; instead, he received only enough money to enable him to pay taxes on income distributions that passed through to him after the business's expenses were paid. Paul's individual 2001 tax return showed a total gross income of $312,832 for that year. At the time of trial, Paul was forty-three years old and in good health.

The parties owned property at 28 Tockwotten Farm Road in North Kingstown, which they purchased in 1996. According to Kathleen, she did a number of renovations on the home and selected a majority of the furniture. Paul said that his wife expressed the view that she did not wish to live in the home only after they bought and moved into the property, while Kathleen said she informed her husband that she did not want to live there before they agreed to purchase the home. Kathleen wanted to move to Barrington instead because she liked that town's educational system and it was close to her parents. Nonetheless, the Tockwotten Farm Road home became the marital domicile.

Paul testified that in April 2002, while the couple were still married, he began a romantic relationship with another woman. He said that from time to time this woman had been in the presence of his children. Pursuant to a court order, the parties were required to engage in counseling to deal with issues pertaining to Paul's visitation of the children, including visitation in the presence of third parties. Paul said that he participated in such counseling only once and continued to see his paramour in the presence of his children thereafter. During the trial, the general magistrate warned Paul that he would impose harsh sanctions if Paul continued to disregard a previously entered court order prohibiting him from exercising visitation with the children in the presence of this other woman.

For reasons not entirely clear from the record, the proceedings were bifurcated [1] on the second day of trial, and the general magistrate granted an absolute divorce to each party, continuing for further hearings the issues of alimony, child support, custody, and an equitable distribution of the parties' assets. Both parties agreed to this procedure. When the trial resumed, both parties also agreed on the appraised value of certain properties, but they could not agree upon the value of Paul's interest in Abacus. Accordingly, during the second

1. It should be noted that in a recent decision, *Cardinale v. Cardinale*, 889 A.2d 210, 212 n. 1, 228 (R.I.2006), this Court said that bifurcation should be used sparingly in divorce cases.

portion of the trial, each party presented an expert witness to testify about the value of this corporate entity.

Craig M. Bilodeau, a certified public accountant, testified for plaintiff. Mr. Bilodeau testified that in evaluating Abacus, he used the income approach to valuation. He explained that the two most common methods of valuing companies under this approach are the discounted future cash flow method and the capitalization of earnings method. He said that he was unable to apply the former method because Paul did not provide any projected income statements—an indispensable component of the discounted future cash flow calculation.[2] Mr. Bilodeau used the capitalization of earnings method instead, which involved calculating the "weighted adjusted net cash flows," which were approximately $167,000, and dividing that figure by the capitalization rate, which was 21 percent, to get a value of the company of $795,000. Mr. Bilodeau then applied adjustments to this value. In particular, he applied a 25 percent discount for the lack of marketability of the company and a 10 percent discount for defendant's lack of control in the company. Ultimately, Mr. Bilodeau concluded that Paul's fair-market value interest in Abacus was $268,000.[3]

The defendant presented the testimony of Michael Pendergast, another certified public accountant, as his expert witness. Mr. Pendergast testified that Paul's interest in Abacus was worth $100,000. He said that to determine this value, he used the income or cash flow approach to valuation. He explained that he developed a cash flow of the business, made some normalization adjustments, applied a capitalization rate, subtracted a value for an existing covenant not to compete, and then "applied marketability discount on small minority discount to arrive at the value." Mr. Pendergast also said that he "tax-affected the earnings of the corporation."[4]

2. The record indicates that Paul was less than forthcoming in providing the documents needed for Mr. Bilodeau to complete his appraisal. For example, during Mr. Bilodeau's initial testimony, he said that he was still waiting to receive a listing of the 2001 accounts receivable from defendant for both Leonelli and Vicario, Ltd. and Abacus. In response to repeated requests for the financial records, Paul advised Mr. Bilodeau on March 10, 2003 that he did not have the information available. Mr. Bilodeau also testified that he had not received any documentation regarding the 2002 tax year from Paul's businesses. Accordingly, during the March 26, 2003 trial date, the court ordered Paul to provide, within three weeks, the 2002 tax returns for both entities, the receivables for 2002, and any accruals or payables at the end of 2002. The record reveals that defendant failed to comply with this request.

3. During another part of the trial, defense counsel requested that Mr. Bilodeau calculate the value of Paul's interest in Abacus using the same methodology that he originally used, "except using the income per books." After this modification of his original calculation, Mr. Bilodeau arrived at the slightly lower value of $265,000 for Paul's interest in Abacus.

4. According to the testimony of the experts, tax-affecting the value of a particular business allows one to arrive at a value for the cash flow of the business after it is taxed by the Internal Revenue Service. In tax-affecting Abacus, Mr. Pendergast indicated that he subtracted the income taxes that were expected to be charged to the corporation from the "Normalized Net Income" to arrive at a "Normalized Net Income After Taxes." Mr. Bilodeau, on the other hand, explained that he did not apply a tax affect to his valuation of Abacus, as Mr. Pendergast had done, because Abacus is a Subchapter S corporation that is not required to pay taxes at the corporate level; instead, income "passes through" the corporation to its shareholders, who are personally and individually responsible for paying taxes on that income. See also DiLuglio v. Providence Auto Body, Inc., 755 A.2d 757, 763 n. 4 (R.I.2000) (explaining the tax consequences of a Subchapter S corporation).

He added that it was his understanding that Paul's role in Abacus was as an investor and that his partnership activity was "[p]assive."

Mr. Pendergast explained that the discrepancy between his valuation and Mr. Bilodeau's was caused by the fact that he, unlike Mr. Bilodeau, tax-affected the earnings, considered the business's nonrecurring revenue, and subtracted values for a covenant not to compete and Paul's business partner's personal goodwill. Mr. Pendergast also testified that Mr. Bilodeau's calculations of the net income cash basis were inaccurate, causing his overall valuation of Abacus to be incorrect. On cross-examination, however, Mr. Pendergast admitted that it was "[p]ossibl[e]" that the availability of a list of Abacus's accounts receivable may have impacted his view of the company's net adjusted value. Similarly, Mr. Pendergast testified that he "would have considered * * * and possibly used" information about the corporation's assets in his valuation, had that information been available. Mr. Pendergast also said that he did not normalize the company's expenses for maintenance and repairs for the relevant years, as Mr. Bilodeau had done, and that if he had done so, it would have added to the income, resulting in a higher value for Paul's interest in the business.

On November 4, 2004, the Family Court rendered a bench decision awarding Kathleen 60 percent and Paul 40 percent of the marital estate, which it determined to be valued at $1,479,814.10. The general magistrate found that the marital estate included: (1) the marital domicile at 28 Tockwotten Farm Road, with an agreed-upon equity of $160,000; (2) the office building at 240 Chestnut Street, valued at $525,000; (3) the appreciation in value of Leonelli and Vicario, Ltd. during the marriage, namely $300,000; (4) Paul's interest in Abacus, or $268,000; (5) Paul's interest in ABAX, LLC, agreed to be worth $22,500; and (6) various investment, IRA, retirement, bank, and escrow accounts.

The Family Court awarded Paul the marital domicile, the Chestnut Street property, and interests in Abacus and ABAX, LLC. Finding that these assets totaled $975,500, or $383,574.36 more than Paul's 40 percent entitlement in the overall marital estate, the general magistrate ordered that Paul pay the difference to Kathleen. He found that Kathleen's 60 percent of the estate equaled $887,888.46. The Family Court also ordered Paul to pay Kathleen alimony of $500 per week for a period of three years. In addition, the court ordered Paul to pay child support, based upon the Child Support Guidelines, of $3,600 per month, and said that the parties would continue to share joint custody of the children, with Kathleen having physical placement and Paul having reasonable visitation rights. Finally, the Family Court assessed a $10,000 sanction on Paul for failing to comply with court orders concerning the discovery of certain financial documents throughout the proceedings.

A decision pending entry of final judgment was entered on December 2, 2004. Paul filed his notice of appeal on the following day. Subsequently, a final judgment of divorce was entered on July 5, 2005. On appeal, defendant challenges a number of the general magistrate's rulings.

### Standard of Review

█ Our standard in reviewing Family Court decisions is deferential. "This Court will not disturb a trial justice's findings of fact in a divorce action unless he or she has 'misconceived the relevant evidence or was otherwise clearly wrong.'" *Horton v. Horton*, 891 A.2d 885, 888 (R.I.

2006) (quoting *Koutroumanos v. Tzeremes,* 865 A.2d 1091, 1097 (R.I.2005)).

### Expert Testimony

■ Paul first argues that the Family Court erred in rejecting the testimony of his expert witness concerning the valuation of Paul's interest in Abacus. In finding that Paul's interest in Abacus was worth $268,000, the general magistrate said that he "accepts the valuation of Mr. Bilodeau and rejects that [of] Mr. Pendergast."

This Court has stated that "[i]t is the duty of the triers of fact to examine and consider the testimony of every witness regardless of his qualifications, and to grant to particular testimony only such weight as the evidence considered as a whole and the proper inferences therefrom reasonably warrant." *Kyle v. Pawtucket Redevelopment Agency,* 106 R.I. 670, 673, 262 A.2d 636, 638 (1970). In addition, we have held that "[j]ust as a trial justice may pick and choose among evidence presented by laypersons, he or she may do the same when dealing with evidence of experts." *Harvard Pilgrim Health Care of New England, Inc. v. Gelati,* 865 A.2d 1028, 1035 (R.I.2004) (quoting *Ferland Corp. v. Bouchard,* 626 A.2d 210, 216 (R.I.1993)). The general magistrate was therefore "free to choose between expert opinions so long as he did so not from mere whim or fleeting caprice but with reasonable justification." *State v. Cook,* 104 R.I. 442, 449, 244 A.2d 833, 836 (1968).

In the present case, in rejecting the testimony of defendant's expert, the general magistrate noted that Mr. Pendergast "included anticipatory expenses [in his calculations] without any basis * * *; clearly an effort to reduce the value of the business." The general magistrate also found that the role of Paul's partner in Abacus, which Mr. Pendergast considered in his valuation, was not relevant to the value of Abacus. In addition, the Family Court concluded that Mr. Pendergast's appraisal, which included a tax affect in the calculation of the value of Abacus, was in contravention of a decision by the United States Court of Appeals for the Sixth Circuit holding that it is improper to tax-affect a Subchapter S corporation when valuing it. *See Gross v. Commissioner of Internal Revenue,* 272 F.3d 333 (6th Cir.2001). Notably, even Mr. Pendergast admitted that he was not aware of any tax court cases subsequent to *Gross* that allowed for tax-affecting in ascertaining the value of an S corporation. Finally, the general magistrate determined that Paul's expert should not have negatively affected his calculations based on an anticipated falloff in business of Abacus when the facts of the case showed otherwise. In light of these factual findings and the general magistrate's discretion to choose one expert's testimony over the other based on his own determinations of credibility, we are satisfied that he did not abuse his discretion in choosing Mr. Bilodeau's opinion of the value of defendant's interest in Abacus over that of Mr. Pendergast.

### Equitable Distribution

■ Paul also argues that the general magistrate erred in awarding Kathleen 60 percent of the marital estate. He contends that although Kathleen is entitled to a portion of the estate, 60 percent was excessive. He asserts that the Family Court merely paid "lip service" to the relevant statutory factors for equitable distribution and "punished [Paul] for his alleged misconduct which really amounted to nothing."

■ "It is well settled in this jurisdiction that trial justices responsible for equitably distributing property in a divorce action must engage in a three-step process." *Horton,* 891 A.2d at 889. "The

trial justice first must determine which assets are marital property, then must consider the factors set forth in [G.L.1956] § 15–5–16.1(a), and finally, he or she must distribute the property." *Koutroumanos,* 865 A.2d at 1096. In applying the statutory factors, "[a]ssets are to be divided equitably, though not necessarily equally." *Perreault v. Perreault,* 540 A.2d 27, 30 (R.I.1988). Additionally, property division "is subject to the concept that nonmonetary, as well as monetary, contributions may enhance the marital partnership." *Stanzler v. Stanzler,* 560 A.2d 342, 345 (R.I.1989). This Court "recognizes the essential supportive role played by a spouse who is not employed outside the home, acknowledging that as a homemaker and child-rearer such spouse is entitled to a share of the family assets." *Wordell v. Wordell,* 470 A.2d 665, 667 (R.I.1984). Moreover, we "will not disturb the trial justice's findings where he or she has scrupulously considered all of the elements set forth in * * * § 15–5–16.1."[5] *Tarro v. Tarro,* 485 A.2d 558, 560 (R.I.1984).

Here, we are satisfied that the general magistrate thoroughly examined the factors set forth in § 15–5–16.1(a) in making the 40/60 marital estate distribution. He determined that the parties were married for fourteen years and that during that time, Kathleen's conduct was "exemplary," while Paul's was not. He noted that Paul carried on a relationship with another woman, purchased expensive items for himself while Kathleen had to borrow money for family necessities, and belittled and ignored Kathleen. He also found that the parties "contributed equally to the marital estate by contributing their respective talents," with Kathleen as the primary provider for the home and the children and Paul as the breadwinner. In addition, the general magistrate found that although the parties both were in good health, Kathleen was not at her highest potential for earning income because of her extended time as a homemaker. He said that she needed more time to secure her advertising degree. Moreover, he found that Kathleen contributed to Paul's success by staying home and allowing Paul to devote himself fully to his business endeavors. Finally, the general magistrate determined that Paul was responsible for the breakdown of the marriage.

With all these findings adequately appearing on the record, we conclude that the Family Court did not err in determining that Kathleen was entitled to 60 percent of the estate. Because the general magistrate "scrupulously considered" all

---

**5.** In Rhode Island, the assignment of property upon divorce is governed by the factors listed in G.L.1956 § 15–5–16.1(a):

"(1) The length of the marriage;
"(2) The conduct of the parties during the marriage;
"(3) The contribution of each of the parties during the marriage in the acquisition, preservation, or appreciation in value of their respective estates;
"(4) The contribution and services of either party as a homemaker;
"(5) The health and age of the parties;
"(6) The amount and sources of income of each of the parties;
"(7) The occupation and employability of each of the parties;

"(8) The opportunity of each party for future acquisition of capital assets and income;
"(9) The contribution by one party to the education, training, licensure, business, or increased earning power of the other;
"(10) The need of the custodial parent to occupy or own the marital residence and to use or own its household effects taking into account the best interests of the children of the marriage;
"(11) Either party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration; and
"(12) Any factor which the court shall expressly find to be just and proper."

the proper statutory factors in light of the evidence, we will not disturb his findings concerning the equitable distribution of the parties' assets. *See Tarro*, 485 A.2d at 560.

## Alimony

█ In addition, Paul challenges the Family Court's award of alimony to Kathleen obliging Paul to pay $500 per week for three years. He contends that the general magistrate placed too much emphasis on Paul's bad conduct during the marriage in determining this award and that the substantial portion of the marital estate that was allocated to Kathleen left her self-sufficient and without a need for alimony. Kathleen counters that the alimony award did not attempt to equalize the parties' grossly disparate incomes, as Paul asserts, but rather properly protected her from dissipating all her marital assets by the time she is able to reenter the work force.

█ "Alimony is a rehabilitative tool intended to provide temporary support until a spouse is self-sufficient, and is based purely on need." *Berard v. Berard*, 749 A.2d 577, 581 (R.I.2000). The assignment of property must precede any determination of alimony because the needs of each party will be affected by the equitable distribution of the marital estate. Section 15–5–16.1(c). In determining the amount of alimony, the court must consider: "(i) [t]he length of the marriage; (ii)[t]he conduct of the parties during the marriage; (iii)[t]he health, age, station, occupation, amount and source of income, vocational skills, and employability of the parties; and (iv)[t]he state and the liabilities and needs of each of the parties." Section 15–5–16(b)(1).[6] "As long as the trial justice considers the statutory elements in § 15–5–16, we will not disturb an alimony award on appeal." *Hogan v. Hogan*, 822 A.2d 925, 928 (R.I.2003).

In *Wrobleski v. Wrobleski*, 653 A.2d 732, 733–34 (R.I.1995), this Court affirmed an award of alimony to a wife who had been awarded 60 percent of a substantial marital estate worth more than $2 million. Although the wife was allocated a higher percentage of the marital assets than the husband, including the marital domicile, we upheld the Family Court's alimony award of $5,000 per month for a period of

---

**6.** The statute goes on to say:

"In addition, the court shall consider:

"(i) The extent to which either party is unable to support herself or himself adequately because that party is the primary physical custodian of a child whose age, condition, or circumstances make it appropriate that the parent not seek employment outside the home, or seek only part-time or flexible-hour employment outside the home;

"(ii) The extent to which either party is unable to support herself or himself adequately with consideration given to:

"(A) The extent to which a party was absent from employment while fulfilling homemaking responsibilities, and the extent to which any education, skills, or experience of that party have become outmoded and his or her earning capacity diminished;

"(B) The time and expense required for the supported spouse to acquire the appropriate education or training to develop marketable skills and find appropriate employment;

"(C) The probability, given a party's age and skills, of completing education or training and becoming self-supporting;

"(D) The standard of living during the marriage;

"(E) The opportunity of either party for future acquisition of capital assets and income;

"(F) The ability to pay of the supporting spouse, taking into account the supporting spouse's earning capacity, earned and unearned income, assets, debts, and standard of living; [and]

"(G) Any other factor which the court expressly finds to be just and proper." Section 15–5–16(b)(2).

five years and thereafter $2,000 per month until further order of the court. *Id.* In so holding, this Court noted that the trial justice had taken into account the proper statutory factors, including the husband's bad conduct and the wife's role throughout the marriage as homemaker and caretaker. *Id.* at 734.

In the present case, we are persuaded that the general magistrate properly considered the relevant statutory factors to determine that Kathleen needed a three-year window of rehabilitative support from her ex-husband to become self-supporting. The general magistrate found that the marriage lasted fourteen years, that Kathleen's conduct was "exemplary" while Paul's was not, that Kathleen served as the homemaker during the marriage, that Paul's yearly income was much higher than Kathleen's, and that Kathleen's attention deficit disorder might affect her potential for employment. Based on these findings, the general magistrate determined that Kathleen needed rehabilitative alimony to allow time for her to secure a degree in advertising and that Paul was in a position to pay such alimony.

We are satisfied that the Family Court properly considered all the statutory factors and rested its alimony decision on the notion of alimony as a rehabilitative tool based upon the parties' relative needs. As in *Wrobleski*, we do not think that the court must deny alimony based solely upon the fact that the spouse seeking support was awarded a large amount of the overall estate. *See Wrobleski*, 653 A.2d at 734. It is proper instead to consider the amount allocated to the alimony-seeking spouse in

light of the rest of the statutory factors. *See Fisk v. Fisk*, 477 A.2d 956, 958–59 (R.I.1984). Because the general magistrate clearly considered all the relevant factors after he made a distribution of the marital estate, we hold that he did not abuse his discretion in awarding alimony to Kathleen.

### Discovery Sanction

■ Finally, Paul argues that the Family Court erred in sanctioning him $10,000 for failing to produce certain documents relevant to the experts' valuations of his businesses. He avers that he was denied due process of law because he was not afforded an opportunity for an evidentiary hearing before the sanction was imposed. He also contends that the general magistrate abused his discretion because Kathleen failed to show that prejudice resulted from the absence of the requested documents.[7]

■ "It is fundamental that the Fourteenth Amendment requires notice and an opportunity to be heard before one is deprived of his property or liberty." *Fricke v. Fricke*, 491 A.2d 990, 997 (R.I.1985). In the present case, however, Paul's due-process rights were not violated because he had ample notice that sanctions would be imposed if he did not comply with the discovery requests at issue. Moreover, Paul had adequate opportunities to be heard on the issue of why he would not produce the financial records during trial and before sanctions were imposed. The record reveals that the original request for the relevant records was made in January

---

7. This last argument suggesting that the Family Court must find prejudice to the opposing party to impose sanctions is without merit. Rule 37(b) of the Family Court Rules of Procedure for Domestic Relations, which lists the proper sanctions for failing to comply with court discovery orders, does not require such a finding. Moreover, Paul cites no authority for either of his contentions that he was entitled to a hearing or a finding of prejudice, thereby precluding this Court from a meaningful review of such arguments. *See* Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure.

2002. During the course of the trial, on March 26, 2003, the general magistrate ordered Paul to produce the records within three weeks, and Paul's counsel indicated that he would produce the records "forthwith." On the same day, an order was entered indicating that Paul would suffer daily sanctions if he refused to comply. In a June 4, 2003 order, Paul again was reminded of the threat of sanctions for failing to comply with the court orders. The defendant could have objected or explained at these junctures why he did not produce the records, but he failed to do so. We therefore see no merit in Paul's due-process challenge.

 Furthermore, we are satisfied that the general magistrate did not abuse his discretion in imposing the sanction. "Rule 37(b) of the Family Court Rules of Procedure for Domestic Relations provides the court with a smorgasbord of sanctions for situations in which the court is presented with a party's failure to comply with a discovery order pursuant to Rule 37(a)." *Lembo v. Lembo,* 677 A.2d 414, 419 (R.I. 1996). Pursuant to Rule 37, this Court has upheld monetary sanctions for such violations. *See, e.g., Zaino v. Zaino,* 818 A.2d 630, 640–41 (R.I.2003); *Lembo,* 677 A.2d at 419. We will "reverse a trial justice's decision to impose sanctions for Rule 37 violations only when we find that he or she has abused his or her discretion." *Zaino,* 818 A.2d at 640 (quoting *Lembo,* 677 A.2d at 419).

In finding that a $10,000 sanction was warranted to offset any additional counsel fees, time lost by Kathleen, and court delays that had resulted from Paul's conduct, the Family Court noted that Paul had failed to follow its mandates regarding discovery of the financial documents for months and that the court had been "most patient over an extended period of time." The general magistrate stressed that

Kathleen's expert witness "had to reassess his testimony all to no avail" because of the violation and that "[t]o this moment the [d]efendant has yet to comply with the Court Order." Based on the record before us, which clearly shows that Paul was unwilling to produce the records in a timely manner throughout the entire proceedings, we see no abuse of discretion in this ruling.

### Conclusion

For the reasons stated herein, the order appealed from is affirmed, and the papers of this case are remanded to the Family Court.