325 A.2d 543.

MAX R. KARGMAN *et al. vs.* STANLEY D. JACOBS, *in his capacity as Tax Assessor of the City of East Providence, Rhode Island.*

OCTOBER 1, 1974.

PRESENT: Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. Max R. and William M. Kargman (plaintiffs) are general partners in the Kent Farm Company (Company), a Massachusetts limited partnership, which owns six parcels of land in the city of East Providence.

Such land, together with all buildings and improvements thereon had been assessed, for the purposes of local taxation, on December 31, 1969[1] in the amount of $188,960. During 1970 and 1971 the Company undertook the construction of a 250 apartment complex which is sometimes referred to in the record as "Kent Farm." The endeavor was regulated by §221(d)(3)[2] of the National Housing Act. In enacting this legislation Congress sought to provide housing for low and moderate income families and for those families which had been displaced by urban renewal. At the close of 1970, the defendant Jacobs (assessor or Jacobs), in a general reevaluation of all property situated in East Providence, valued the plaintiffs' real estate at $2,535,780. A year later, on December 31, 1971, he further increased the valuation to $3,021,420.

The plaintiffs challenged those two assessments by filing two petitions in the Superior Court under G. L. 1956 (1970 Reenactment) §§44-5-26 through 44-5-31 on the grounds that their real estate had been assessed at a valuation in excess of its full and fair cash value, *i.e.*, that the assessments were illegal and void. In attacking the valuation arrived at by defendant, plaintiffs presented evidence of a real estate appraiser to the effect that the full and fair

---

[1]The levy and assessment of local taxes in Rhode Island is governed by G. L. 1956 (1970 Reenactment) ch. 5 of title 44. The taxes are assessed "in arrears," in that on the 31st day of December each year the valuations are determined for the tax to be collected the following year. *See* §44-5-1. Hence, taxes paid during 1970 are based on a valuation of the property as of December 31, 1969.

[2]Housing Act of 1954, §221(d)(3), 12 U.S.C.A. §1715 L(d)(3) (1964), as amended (Supp. V, 1965-69).

cash value of their property on December 31, 1970 was $1,032,201 and on December 31, 1971 was only $1,227,330.[3]

The two petitions were consolidated for trial. After a hearing in the Superior Court, a justice thereof rendered a decision for the assessor. The plaintiffs appealed.

The methods by which the two experts arrived at their conclusions were both recognized means of assessing real property.

The parties stipulated that no comparable sales were known to have taken place in the open market which might have assisted them in determining the proper value of the buildings and improvements.

The assessor, who qualified as an expert, testified that he employed the "reproduction cost" approach[4] to assess the buildings and improvements. Comparable sales were available to aid in placing a value on the land, and, therefore, he based his assessment of the land on such sales. The same method was used for both the 1970 and 1971 appraisals. In each instance he had taken into consideration what a willing buyer would pay for the property and what a willing seller would sell it for. He regarded as irrelevant what income the property would produce. The

---

[3] While we refer to plaintiffs' property as being assessed at its full and fair cash value, G. L. 1956 (1970 Reenactment) §44-5-12 authorizes an assessment at a "uniform percentage" thereof. The percentage used by the assessor was 80%. The valuations given by plaintiffs' expert were also pegged at that figure. Construction of the complex began in 1969 and was completed in early 1971.

[4] "Reproduction cost" is the amount of money, based on current prices in the market, that would be required to duplicate a building or improvement with a new property or replica, made of the same or basically similar materials. The value of property is arrived at by the following formula: estimated reproduction or replacement cost of the building new, less estimated accrued depreciation, if any, plus the estimated land value. See *Travellers Bldg. Ass'n* v. *Providence Redevelopment Agency*, 106 R. I. 83, 256 A.2d 5 (1969).

assessor also maintained that the reproduction cost method was the basis for taxation not only of the entire city of East Providence but also of all the other cities and towns of Rhode Island, and that the approach is a common one in conducting a "mass appraisal."

The plaintiffs' expert presented much more detailed testimony than that of Jacobs. He assessed the property by the "capitalization of income approach."[5] In his opinion, the property should have been valued at the substantially lower figure.

In reaching his conclusion, the taxpayer's expert asserted that he had studied the items of income and expense involved in the operation of the apartment community. He deduced that the potential net income from the complex was $122,733. It was his judgment that a purchaser of a property of this kind would expect a return on his investment of at least 10%. Therefore, the expert multiplied the net income figure by 10, resulting in the $1,227,330 total.

The trial justice accepted the value as estimated by Jacobs. He viewed the problem as one concerning the burden of proof. The plaintiffs had the obligation of

---

[5] This approach to real estate evaluation is a method of estimating value based on factual data with respect to the income yield of the property. It is a mathematical process for converting the stream of income derived from real estate into capital value. Value is based on the present and prospective income from the property. A factor known as the "capitalization rate" is applied to the estimated net annual income produced by the property to determine its value. This capitalization rate is the rate representing a fair return on the investment. For example:

Estimated net annual income from the property is $16,665

A fair return on the investment (capitalization rate) is 8.2%

Then if .0825     equals $ 16,665

.01     equals $ 2,020

100%     equals $202,000

The indicated value of the property is therefore $202,000. *See* Friedman, *Encyclopedia of Real Estate Appraising* at 36-37 (1968).

establishing the illegality of the appraisal. The trial justice believed that the method employed by Jacobs was "one of the recognized and accepted ways of ascertaining value," and that since defendant's method was a proper one, plaintiffs had failed to carry their burden.

The plaintiffs' principal argument is that the trial justice's approval of defendant's determination of the value of their property was in total disregard of the evidence of its earning capacity, and that he arbitrarily rejected plaintiffs' expert testimony as to the appropriate capitalization factor to be used. Therefore, the argument proceeds, the decision is clearly erroneous. We do not agree.

Referring to the testimony presented by the real estate experts for both parties, we shall set forth that part of the record which puts the purposes of such enterprises as Kent Farm in their proper focus.

One of plaintiffs' witnesses was a gentleman who was an attorney and a certified public accountant. He described himself as an employee of a management firm that is charged with the everyday operations of Kent Farm. He told the trial court that his firm specializes in assembling a syndicate that will provide housing for low and moderate income families. He explained that all facets of such enterprises are subject to federal regulation, including a limit as to the amount of the monthly rental charge. The investors are restricted to a maximum 6% return. However, he also pointed out that investors in such developments can obtain a federally guaranteed mortgage at a rate of 3% while the investors in a privately financed complex can look forward to paying a 7½% to an 8½% mortgage. There is no personal liability on the investor's part in event of a foreclosure by the Federal Government agency. This witness told of the liberalized depreciation benefits available to one who invests in a project such as Kent Farm. The depreciation benefits were described as "ex-

cellent" and the 6% return as the frosting on the cake. It is quite apparent that a properly operating federally financed housing development[6] can bring joy to both the tenants and the investors. The tenants have housing at a most reasonable rate and the investors can bask in the glow of a most attractive tax shelter. However, there were two flies in the ointment at Kent Farm—an apparently unforeseen high number of vacant dwelling units and the assessments made by East Providence.

We see the issue before us as one in which, when all is said and done, plaintiffs are arguing that the trial justice should have believed their expert instead of defendant's.

In *Socony-Vacuum Oil Co.* v. *French*, 88 R. I. 6, 143 A.2d 318 (1958), this court held that a trier of facts can accept the valuation of property of one set of experts and reject that of another set of experts, particularly when he gives good reasons for doing so. Just as he may pick and choose among evidence presented by laymen, he may do the same when dealing with evidence of experts. That rationale is controlling here.

The plaintiffs' contention that the trial justice acted in an arbitrary manner in rejecting the capitalization of income formula used by their expert is without merit. The trial justice had no quarrel with the proposition that the income from real property is a proper factor to be considered in fixing its valuation for tax purposes. The plaintiffs' difficulty arises from the trial justice's rejection of their witness' appraisal on two specific grounds—the capitalization factor used by the expert and the expert's insistence that the rental income figures he was using were comparable to those being charged by privately financed apartment facilities in the area.

---

[6]The amount of the mortgage granted by the Federal Government was in excess of $5,000,000.

A crucial choice made by plaintiffs' expert was his use of a capitalization factor of 10%. He stated that "from experience" it was his judgment that a purchaser of this type of property would expect such a return. The trial justice refused to accept this figure on the expert's bald reference to his experience, especially in the absence of any evidence by plaintiffs as to what other income-producing opportunities might have been available to the purchaser envisioned by the expert. Furthermore, the expert testified that so far as he could determine, a search of the 50 states had failed to disclose one sale of a housing development such as Kent Farm.

Later, however, the expert remarked that the rental figures he used were comparable to the rents being charged by the privately financed apartment complexes in the neighborhood. This finding of comparability followed the making of "adjustments" for lack within the project of such amenities as air conditioning or security services, plus a further adjustment for the difference in locations. These adjustments were made "by judgment" based on the expert's "experience" in evaluating properties. The lack of specificity pertaining to the experience upon which the expert's judgment rested caused the trial justice to give no weight to this expert's opinion as to the full and fair cash value of their property on the assessment dates in question. The burden of proof is upon the taxpayer to establish his contention that defendant assessor has set a value on the subject property that is greater than its full and fair cash value. The trial justice felt, and with good reason, that the burden had not been met. We see no reason to disturb this finding.

Finally, a brief comment should be directed to an assertion made by plaintiffs to the effect that the trial justice had ruled that a city-wide assessment of real estate by use of the cost of reproduction technique constituted an auto-

matic compliance with the statutory requirement that property be assessed at its full and fair cash value. The plaintiffs have misconceived the thrust of the trial justice's ruling.

The trial justice in discussing the assessor's use of the cost of reproduction standard observed that the power to tax is vested in the General Assembly, which shall provide for "* * * making new valuations of property * * * in such manner as they may deem best." R. I. const. art. IV, §15. The General Assembly in turn has delegated this authority to the assessors of each municipality. Section 44-5-11. They are authorized to determine value in the same manner as the Legislature might have, in this instance, as the East Providence assessor deems best. He is given the choice as to which method of valuation he will employ.

In *Allen* v. *Bonded Municipal Corp.*, 62 R. I. 101, 4 A.2d 249 (1938), this court said:

> "The constitutional requirement of fairness in taxation is met if a taxing law demands that it be applied with substantial uniformity without discrimination throughout a class of property set apart for separate taxation." *Id.* at 105, 4 A.2d at 251.

It is our belief that the tax assessor is not bound by any particular formula, rule or method as he seeks to ascertain the fair market value of real estate. His choice of one of the recognized methods of valuation is simply an exercise of the discretion referred to in our constitution.

The cost approach has been described as the only economically feasible method to be employed when preparing a mass appraisal of real estate. Friedman, *Encyclopedia of Real Estate Appraising* at 1021 (1968). It has been often said that the cost approach "tends to set the upper limit of value." This is a misstatement of the old principle that "cost new tends to set the upper limit of value." The word "tends" is important since properties, partic-

ularly income-producing properties, frequently sell for more than their original cost because they are favorably tenanted and available, income benefits can be enjoyed at once, and no out-of-pocket expenses, risk, delay and entrepreneurship are required to produce an attractive investment. The cost approach, particularly in the absence of comparable sales, affords at least some basis for rationalization as to market value. The assessor must estimate market value whether or not market data is available. Since cost information is available directly from the market, it is significant that someone actually paid money to construct the improvements upon a particular site. Friedman, *supra* at 14-15.

Admittedly, some reservations have been expressed as to the accuracy of the result obtained when the cost approach is used. We have acknowledged that the use of this technique can cause an excessive valuation unless the costs are adequately discounted for such items as obsolescence, inadequacy and physical depreciation. *Travellers Bldg. Ass'n v. Providence Redevelopment Agency,* 106 R. I. 83, 256 A.2d 5 (1969). However, it also recognized that reliance on income approach should be closely scrutinized because the resulting mathematical calculations, even though made in good faith, can lead to divergent results. *Aetna Life Ins. Co. v. City of Newark,* 10 N. J. 90, 89 A.2d 385 (1952). Kent Farm is truly a case in point.

The gross apartment rental figure used in its appraisal assumes a 100% rental for all units during the year 1971. However, the East Providence enterprise is limited by governmental order as to the amount of monthly rental it can charge. In seeking to establish fair market value, one looks for the fair rental value rather than the actual income received. In using the income approach, the significant element to be established is the realty's capacity for earning income rather than income actually derived

from its operation. *Springfield Marine Bank* v. *Property Tax Appeal Board,* 44 Ill.2d 428, 256 N.E.2d 334 (1970). At this point there is no credible evidence that Kent Farm's rental was fair rental income.

Further evidence as to the mathematical morass that can be encountered with the income approach can be seen by Kent Farm's expert's inappropriate use as an expense item of the taxes actually assessed by East Providence but now being challenged in these proceedings.

The employee of the Kent Farm's management firm told the trial court that something went wrong with the "market analysis." There was no "immediate rent up" and then came the "tax problem." Such a miscalculation reminds one that "* * * the valuations of properties for local taxation cannot vary with the managerial successes or failure of the owners." *City of New Brunswick* v. *State of New Jersey Div. of Tax Appeals,* 39 N. J. 537, 189 A.2d 702 (1963).

The appraisal of real estate is not a precise science. We cannot fault Jacobs' assessments of the subject property.

The plaintiffs' appeal is denied and dismissed.

Mr. Chief Justice Roberts did not participate.

Mr. Justice Joslin, dissenting. In my judgment, employment of the "reproduction cost" method to assess the land, buildings and improvements known as the "Kent Farm Village" produces a valuation substantially in excess of the property's full and fair cash value. The resulting assessment is therefore illegal and, when challenged, should not be allowed to stand. I therefore respectfully dissent.

In appraising the Kent Farm the assessor's obligation was to ascertain its full and fair cash value, that is, the amount which a willing buyer would probably pay to a willing seller in an arm's length transaction in a fair

market. *Allen* v. *Bonded Municipal Corp.*, 62 R. I. 101, 105, 4 A.2d 249, 251 (1938). In that market obviously buyer availability would be limited to investors. And while an investor might resort to the reproduction cost approach to obtain an upper limit beyond which he would not pay, 2 Orgell, *Valuation Under Eminent Domain* §199 at 57 (2d ed. 1953), he would do so fully aware that the cost of the reproduction approach is one of the "least reliable indicia of market value," *Travellers Bldg. Ass'n* v. *Providence Redevelopment Agency*, 106 R. I. 83, 89, 256 A.2d 5, 9 (1969), and entitled to "weight only in those cases where more satisfactory evidence based on actual sales or on earning power is not available." 2 Orgell, *supra* §199 at 57.[1]

In this case there were no comparable sales, and therefore the only way to obtain a realistic point of reference in the valuation process was to capitalize the property's income-producing potential. Yet, in valuing the property as of December 31, 1971 at approximately $3,776,775,[2] the tax assessor, in effect, looked to a building contractor's estimate of its reproduction cost rather than to an accountant's ascertainment of its earning capacity. True, the absence of a full year's operation of the apartment com-

---

[1] I do not question the appropriateness of the reproduction cost approach for determining the fair market value of "* * * so-called 'service properties,' that are owned for nonprofit uses and that seldom come on the market. Churches, club-houses, golf-courses, schools and university buildings are of this nature." 2 Orgell, *Valuation Under Eminent Domain* §188 at 4 (2d ed. 1953); *Travellers Bldg. Ass'n* v. *Providence Redevelopment Agency*, 106 R. I. 83, 256 A.2d 5 (1969) (clubhouse for fraternal organizations); *Trustees of Grace & Hope Mission* v. *Providence Redevelopment Agency*, 100 R. I. 537, 217 A.2d 476 (1966).

[2] Real estate in East Providence was assessed as of December 31, 1971 at a uniform percentage of 80% of full and fair cash value. Hence, the assessment of $3,021,420 against the taxpayers' land, buildings and improvements was based upon a full and fair cash value of $3,776,775.

plex would have required that some figures be projected and others estimated. But that was not an insurmountable obstacle. Indeed, such projections and estimates were made by the real estate expert who testified for the taxpayers in this case. His calculations indicated a net income for the current year, prior to depreciation,[3] of $122,733, or a rate of return of 3.25% on the accessor's valuation.

The majority regard the expert's calculations with suspicion, and they reject it initially because the amount which he allocated to rental income, although it assumed a 100% occupancy throughout the year, was based upon the rentals actually received rather than upon an estimate of fair rental value. While the principle upon which they premise that conclusion is generally sound, *Somers* v. *City of Meriden*, 119 Conn. 5, 8-12, 174 A. 184, 186-87 (1934), it clearly is inapplicable in the peculiar circumstances of this case where concededly the actual rentals were the maximum which the law permitted to be charged.

A further fault which the majority find in the expert's computation stems from the inclusion as an expense item of the very tax which the taxpayers are challenging as illegal. I agree arguendo that a preferable approach might have been to apply the capitalization rate to net income before taxes, and then to compensate by increasing that rate to yield the return an investor would reasonably expect plus the amount of taxes payable. That was the approach which was approved in *City of New Brunswick* v. *State of New Jersey, Div. of Tax Appeals*, 39 N. J. 537, 545-46, 189 A.2d 702, 707 (1963).

---

[3] If a straight line depreciation rate of as little as 2% had been used, the net income would have been further reduced by about $75,000. Some courts treat depreciation as a deduction from gross income, others as a factor in determining the capitalization rate. In any event, it is generally recognized to be a relevant circumstance at the market place. *City of New Brunswick* v. *State of New Jersey, Div. of Tax Appeals*, 39 N. J. 537, 547-48, 189 A.2d 702, 708-09 (1963).

But at this point I am not concerned with capitalizing income in order to value the property for *taxation,* but with testing the assessor's valuation by ascertaining whether on December 31, 1971 a buyer could have been found willing to invest $3,776,775—the price put on the property by the assessor—in order to realize a net income, prior to depreciation of $122,733, or a 3.25% return on his investment.

Whether that would have been possible obviously depended upon the conditions then prevailing in the money market. An examination[4] of those conditions discloses that AAA tax exempt securities with 20-year maturities were then yielding a 5% return; AAA corporate bonds with like maturities—7.2%; obligations of the United States maturing in 1992—5.8%; and deposits in local mutual savings banks—from 4.5% to 6% depending on the nature of the deposit. Clearly, the substantially higher rates of return which those better quality, lower risk investments were then paying would have stifled the willingness of a potential buyer to pay for the Kent Farm property what the assessor said it was worth. Hence, the property was overassessed and the tax therefore illegal.

What remains is to ascertain the amount of the overtax, and that, of course, depends on whether the record discloses what in fact was the property's full and fair cash value. While the taxpayers' expert capitalized the net income he had projected in order to arrive at such a figure, the trial justice rejected his conclusion, not because of any question as to his expertise, but solely because of the absence of an evidential underpinning to the capitalization rate used. That I am not prepared to say that the trial justice erred in this respect does not mean that I

---

[4] I take judicial notice of these rates of return. *Simpson* v. *United States,* 252 U. S. 547, 550, 40 S.Ct. 367, 368, 64 L.Ed. 709, 712 (1920); *see Anderson* v. *Anderson,* 107 R. I. 202, 210, 266 A.2d 56, 61 (1970).

must accept the assessor's excessive valuation. Instead, in this peculiar circumstance, what seems appropriate is to remand to afford both parties an opportunity to follow the capitalization of rental income approach and thus to arrive at a legal assessment. While such a remand may be unusual in a nonjury case, it is not without precedent. *South County Sand & Gravel Co.* v. *Bituminous Pavers Co.*, 108 R. I. 239, 246, 274 A.2d 427, 431 (1971); *Golden Gate Corp.* v. *Barrington College*, 98 R. I. 35, 45, 199 A.2d 586, 592 (1964); *Rhode Island Hospital Trust Co.* v. *Gilleney*, 61 R. I. 23, 27, 199 A. 691, 693 (1938).

Petition for reargument denied.

*Edwards & Angell, James K. Edwards, Jonathan E. Cole,* for plaintiffs.

*Joseph T. Little,* Asst. City Solicitor, for defendant.