DECISION
This matter is before the Court on an appeal from a decision of the Tax Board of Review of the Town of Lincoln ("Town") with respect to the Town's tax assessment of real property owned by UTGR, Inc. ("UTGR" or "taxpayer"), and located at 100 Twin River Road, Lincoln, Rhode Island, as of December 31, 2006.[1]
 I Background Facts
1. The Twin River Casino (Twin River or Casino) is located on the subject property and is currently owned by UTGR. The Casino operates under a Master Video Lottery Terminal Contract with the State of Rhode Island (the "Master Contract").
2. The Casino has secured a video lottery and gaming entertainment license to operate at a facility formerly known as Lincoln Park. Lincoln Park originally operated as a thoroughbred race track, and thereafter, as a dog racing facility until 2009. Current operations consist of approximately 4,750 video lottery terminals (VLT). These VLTs in the recent past co-existed *Page 2 
with the dog racing activities, as well as simulcast racing broadcast to the facility from outside racetracks ("simulcast racing"). At present, dog racing has been discontinued, and gaming continues exclusively through VLTs together with simulcast racing.
3. In addition to gaming space, the facility includes restaurants and entertainment amenities, and a large parking area.
4. Due to the unavailability of table games, and other traditional casino forms of betting, as well as the absence of hotels and retail shopping space, this type of gaming establishment is considered a slot casino or "racino," also referred to as a "convenience casino." Conversely, facilities with a full array of gaming options and greater amenities such as accommodations are known as a "destination casinos."
5. By reason of its unique characteristics, as well as the restrictions imposed by the State and local zoning, for tax assessment purposes it is considered a special use property.
6. Under the Master Contract with the State, the existing video lottery gaming facility had to be renovated and reconstructed. Said construction included removal of the existing dog racing grandstand; conversion of the existing third floor into "back of the house" (or administrative) space; 13,000 square feet of new gaming space to permit operation of 4,750 VLTs, new buffet food service space; and, an all-purpose event center of approximately 29,000 square feet. At the time that construction commenced, the racino consisted of approximately 300,000 square feet. The Master Contract required UTGR to maintain and operate the existing facility during construction and renovation; accordingly, construction, renovation, and demolition proceeded in phases, beginning in 2005 and continuing through to the end of 2007.
7. As previously stated, the original facility operated as a thoroughbred race track. It consisted of a track, a large concrete grandstand, and club house designed to accommodate *Page 3 
30,000 patrons daily. The three-story concrete grandstand no longer has any functional utility to the present use as a VLT gaming facility.
8. Upon completion of renovation and reconstruction, the facility contained approximately 508,349 square feet. (Plaintiff's Exhibit 4.) The land on which the casino operates consists of approximately 160.7 acres (Property Report Cards).
9. UTGR has challenged the assessed value of the real property as determined by the Town, and seeks a rebate of the taxes computed and paid under the alleged erroneous assessment. The challenged assessments were made by the Town as of December 31, 2006, and December 31, 2008, and tax bills were sent to the taxpayer who paid the assessments in 2007 and 2009, respectively.
 II Facts Relative to Assessment and Travel
The subject gaming facility is zoned CR-2 (commercial/recreational). It is the only privately-owned CR-2-zoned parcel in the Town. For that reason, and by virtue of the special restrictions and entitlements set forth in the Master Contract, the property is considered a "limited market" property. The assessment as of December 31, 2006, was pursuant to a town-wide "statistical update" of the prior full re-evaluation conducted as of December 31, 1993.[2]
It is undisputed that the taxpayer timely filed its appeals with the tax assessor for assessments made as of December 31, 2006, and December 31, 2008, and thereafter, timely appealed to the Board of Review. It also is undisputed that the petitions filed with this Court with respect to those assessments were timely filed. Therefore, pursuant to G.L. 1956 § 44-5-26, this Court has subject-matter jurisdiction to consider the petitions. *Page 4 
UTGR has sought consolidation of the two petitions that relate to the December 31, 2006, assessment (P.C.-08-2614) and the December 31, 2008, assessment (P.C.-10-1172). Since the Court has subject matter jurisdiction over both matters, and the parties are agreeable to consolidation, such consolidation seems reasonable and will be ordered. Accordingly, the Decision of this Court will address the challenge to both the December 31, 2006, assessment (P.C.-08-2614) and the December 31, 2008, assessment (P.C.-10-1172), and the cases are considered to be consolidated for all purposes.
 III Motion to Amend
It is undisputed that UTGR did not file an appeal from the December 31, 2007, assessment in accordance with § 44-5-26. However, despite this failure to follow the procedures required in the statute, on the day the trial commenced, UTGR filed a Motion to Amend in order to add consideration of the December 31, 2007, assessment. The Town has objected to the motion, asserting that this Court lacks subject matter jurisdiction to review that assessment because UTGR failed to timely file for review under § 44-5-26. The Court agrees that UTGR's failure to follow the exclusive remedies provided in § 44-5-26 deprives this Court of subject matter jurisdiction to review the December 31, 2007, assessment.
Section 44-5-26 provides in pertinent part: "Any person aggrieved on any ground whatsoever by an assessment of taxes against him or her . . . may within (90) days from the date the first tax payment is due, file an appeal in the local office of tax assessment. . . ." Section 44-5-26(a). Thereafter, "[a]ppeals to the local tax board of review are to be filed not more than thirty (30) days after the assessor renders a decision and notifies the taxpayer, or if the assessor does not render a decision within forty-five (45) days of the filing of the appeal, not more than *Page 5 
ninety (90) days after the expiration of the forty-five (45) day period." Id. The local tax board of review then has ninety days from the filing to "hear the appeal and render a decision within thirty (30) days of the date that the hearing was held."Id.
The statutory application form contained in § 44-5-26(b), and entitled "Taxpayer information about appeal procedure," provides that
 "[a]ny person still aggrieved on any ground whatsoever by an assessment of taxes against him or her in any city or town may, within thirty (30) days of the tax board of review decision notice, file a petition in the superior court for the county in which the city or town lies for relief from the assessment, to which petition the assessors of taxes of the city or town in office at the time the petition is filed shall be made parties respondent, and the clerk shall thereupon issue a citation. . . ." Section 44-5-26(b).
It is well-established that the interpretation of a statute is a question of law. See Palazzolo v. State ex rel.Tavares, 746 A.2d 707, 711 (R.I. 2000). Where the language of a statute "is clear on its face, then the plain meaning of the statute must be given effect and this Court should not look elsewhere to discern the legislative intent." Retirement Bd. of Employees'Retirement System of State v. DiPrete,845 A.2d 270, 297 (R.I. 2004) (internal quotations omitted). When "a statutory provision is unambiguous, there is no room for statutory construction and [this Court] must apply the statute as written."Id.; see also State v. Santos,870 A.2d 1029, 1032 (R.I. 2005) ("The plain statutory language is the best indicator of legislative intent.").
Section 44-5-27 states that the statutory remedy contained in § 44-5-26 is the "exclusive" remedy available to the taxpayer.[3] In interpreting § 44-5-27, our Supreme Court has held that *Page 6 
"the exclusive remedy for anyone aggrieved by a municipal assessment is provided in the taxing statute." Burrillville Racing Ass'n v.Tellier, 574 A.2d 749, 750-751 (R.I. 1990) (citing NorthgateAssociates v. Shorey, 541 A.2d 1192 (R.I. 1988) and Tripp v.Merchants' Mutual Fire Insurance Co., 12 R.I. 435, 436 (1879));see also Murray v. Rockaway BoulevardWrecking Lumber Co.,108 R.I. 607, 609, 277 A.2d 922, 924 (1971) ("Regardless of whether a tax is attacked on grounds of over assessment or illegality, the taxing statutes provide the exclusive relief to any person aggrieved by any assessment of taxes against him by any city or town.").
The statutory time limits recognize that although both "the taxpayer and the municipality have an obvious interest in the amount and accuracy of the individual assessments[,] [t]he municipality has an additional concern that disputes relative to an assessment be resolved as expeditiously as possible so that the tax roll may be finalized and the tax rate established." NorthgateAssociates, 541 A.2d at 1193. Thus, "the Legislature[,] in enacting § 44-5-27, recognized the necessity for finality in assessment disputes when it stated that the taxpayer's complaint was to be filed within three months of the last day specified for payment without a penalty of such tax." Id.
In Northgate Associates v. Shorey, a similar situation arose with respect to a motion to amend. There, the taxpayer sought review of a municipal tax assessment made as of December 31, 1979.Id. at 1192. Thereafter, and while the case was pending, the taxpayer paid its annual assessments with the notation "under protest" written on the check. Id. It then asked the Court to consider assessments for the intervening years from the time the initial assessment was made until the time of the hearing in 1985.Id. *Page 7 
Although the trial court found that the 1979 assessment was excessive, it refused to consider any assessments made after the 1979 appeal for failure to timely follow the statutory procedures for review. Id. at 1192-93. The Supreme Court affirmed the trial justice by relying on the language of § 44-5-27, which states that the remedy provided by § 44-5-26 is the exclusive remedy for review of the assessment in any given year. Id. at 1193. In so doing, the Court rejected the taxpayer's argument that § 44-5-26 should be construed to permit a single petition for relief to serve as a basis for challenge to all the annual assessments with which it finds fault. Id. The taxpayer's position was that the 1979 assessment formed the basis for the assessment in subsequent tax years and, therefore, excused its failure to seek review of each subsequent assessment which was based on the 1979 assessment. Id. However, even though the trial court found the 1979 assessment to be "excessive," "the taxpayer was statutorily required to file a complaint with respect to any given tax year" within the time frame set forth in § 44-5-26 and § 44-5-27. Id.; see alsoMcKee v. Bouchard, 674 A.2d 378, 379 (R.I. 1996) (holding "that a taxpayer who challenges an assessment must file a complaint for each tax year that an assessment is under challenge") (citingNorthgate Associates, 541 A.2d at 1193).
It also should be noted "that a tax assessor may carry over the same fair-market-value finding from one tax-assessment date to the next." See Wickes Asset Management, Inc. v. Dupuis,679 A.2d 314, 320 (R.I. 1996) ("[A]s a practical matter, assessors cannot be expected to revalue every year, even though changes which affect property values may occur within a given year.") (quotingUniroyal, Inc. v. Board of Tax Review of Middlebury,182 Conn. 619, 629-30, 438 A.2d 782, 787 (1981)). Accordingly, the statutory framework established by the legislature does not suggest that the taxpayer, by taking appeal from the assessment which formed the "base-year property value," is forgiven from following the statutory appeal procedures as to *Page 8 
every subsequent annual assessment. See Wickes AssetManagement, Inc., 679 A.2d at 320 (noting that because §§ 44-5-26 and 44-5-27 provide interim remedies, "a property owner disputing an assessment carried over from a prior year is not precluded from challenging the assessment and is therefore not necessarily `locked into' that value until the next decennial revaluation.").
Thus, a taxpayer is statutorily required to file a complaint with respect to any given tax year within the prescribed time frame of § 44-5-26. See Northgate Associates,541 A.2d at 1193; see also deBourgknecth v.Rossi, 798 A.2d 934 (R.I. 2002) ("Although tax assessment history may be relevant, each annual assessment of property for taxation is a separate act independent of the assessment of the same property for other years."). (Citations omitted.) Accordingly, although the December 31, 2006, assessment served as the base-line assessment for the December 31, 2007 assessment, that fact did not excuse UTGR's failure to follow proper administrative procedures for challenging that assessment. Consequently, the Motion to Amend must be denied.
To summarize, as a result of the Court's granting the motion to consolidate, the Court will hear and determine in this action the validity of assessments for December 31, 2006, and December 31, 2008. However, the Court will not consider the validity of the December 31, 2007, assessment by way of amendment; consequently, it shall remain as originally assessed. The Court next will consider the conflicting evidence of valuation presented during the trial.
 IV Valuation Methodology and Analysis
At trial, the parties each presented an expert to testify as to the value of the subject property. The difference between their respective conclusions as to value was not insignificant. *Page 9 
Consequently, the Court must weigh and evaluate the trial evidence and the credibility of the witnesses. See Bruce v. WeeklyWorld News, Inc., 310 F.3d 25, 30 (1st Cir. 2002) (stating that a court sitting, "qua factfinder, was entitled to make the crucial credibility determination as between the competing expert witnesses").
Section 44-5-12(a) provides in pertinent part:
 "All real property subject to taxation shall be assessed at its full and fair cash value or at a uniform percentage of its value, not to exceed one hundred percent (100%), to be determined by the assessors in each town or city. . . ."
"Full and fair cash value" is defined "as fair market value[,]" where "fair-market value means that price the property would probably bring in a transaction in a fair market between a willing seller and a willing buyer." Harvard Pilgrim Health Care ofNew England, Inc. v. Gelati, 865 A.2d 1028, 1035 (R.I. 2004) (internal quotations omitted) (quoting FerlandCorp. v. Bouchard, 626 A.2d 210, 215 (R.I. 1993).
In making a determination as to fair market value, the assessor
 "is not bound by any particular formula, rule or method . . . to ascertain the fair market value of real estate. The choice of a particular method is a discretionary act authorized by our state constitution and delegated by the General Assembly to our state's various municipal assessors. [T]ax assessors are entitled to a presumption that they have performed their acts properly until the contrary is proven. The taxpayer in a tax assessment challenge bears the burden of proving that the assessor's valuation exceeds fair market value. If the taxpayer . . . claims that the assessor used an inappropriate fair market value . . . the burden will be on the taxpayer to present evidence of fair market value. The fact-finder can accept the property valuation of one set of experts and reject that of another set of experts. . . . Just as a trial justice may pick and choose among evidence presented by laypersons, he or she may do the same when dealing with evidence of experts. Harvard Pilgrim Health Care of New England, Inc., 865 A.2d at 1035 (internal citations and quotations omitted). *Page 10 
The assessments made relate specifically to the values of the real property, not the value of the business operation maintained thereon; accordingly, "valuations of properties for local taxation cannot vary with the managerial successes or failure[s] of the owners." Id.
Our Supreme Court has held "that evidence of comparable sales is the preferred indicator of fair market value." Sweet v. Townof West Warwick, 844 A.2d 94, 98 (R.I. 2004). Such an approach requires an analysis of
 "prices paid in the open market at or about the time of the taking for substantially similar and comparable properties, when available and when proper adjustments can be made for minor differences between the properties. Significant factors that affect comparability include location and character of the property, proximity in time of the comparable sale, and the use to which the property is put. Generally, when evidence of comparable sales is available, other methods of deducing fair market value should not be employed. . . . Evidence of comparable sales is preferred because such figures provide the best evidence of fair market value. When evidence of comparable sales is not available or is inappropriate, however, other methods of valuation may be employed." Id.
(internal quotations and citations omitted) (emphasis added).
Thus, "the finder of fact may deviate from the comparable sales method of valuation when the evidence of comparable sales is `no longer probative.'" Id. (quoting Corrado v. ProvidenceRedevelopment Agency,117 R.I. 647, 657, 370 A.2d 226, 231 (1977)).
In the present case, both parties presented expert appraisers. Neil Dupuis (Mr. Dupuis), President and owner of Certified Revaluation Company, testified as an appraisal expert on behalf of the Town.[4] James Houle (Mr. Houle), certified real estate appraiser, licensed real estate broker, and deputy tax assessor for the City of Newport, testified as an expert appraiser on behalf *Page 11 
of UTGR. Both experts testified that the property's highest and best use was gaming, and they each stated that they had utilized the Replacement Cost Method (RCM) of valuation.[5]
The cost approach values the improvements on the property. It "has been described as the only economically feasible method to be employed when preparing a mass appraisal of real estate."Kargman v. Jacobs,113 R.I. 696, 704, 325 A.2d 543, 548 (1974). However, "the use of this technique can cause an excessive valuation unless the costs are adequately discounted for such items as obsolescence, inadequacy and physical depreciation." Id. at 705, 325 A.2d at 548.
Functional obsolescence has been described as including
 "a loss of value which is inherent in a building because of its inability to perform adequately its intended function. It is usually represented by antiquated design, appearance, over design and other structural features outdated when compared with modern design and construction. Functional obsolescence may also be described as a loss in value resulting from inadequacies in a structure either in its inception or as the result of technological improvements which develop in the course of time." Burrillville Racing Ass'n v. Tellier, 574 A.2d 749, 753 (R.I. 1990).
At trial, the experts both described the RCM as consisting of the following steps: (1) determine the value of the raw land as unimproved or vacant; (2) estimate the cost of constructing a building that would achieve the same functional utility as the existing improvements; (3) add the land value to the estimated construction cost; and (4) subtract depreciation.
As to the December 31, 2006, assessment, the existing casino buildings ("improvements") included a 508,349 gross square ft. casino building. This consists of gaming space together with space for accessory uses such as restaurants, a food court, entertainment, etc. *Page 12 
The improvements also include some accessory buildings of relatively insignificant value, including a kennel and veterinary building (at the time, and until 2009, Twin River hosted pari-mutual betting on greyhound racing). On December 31, 2006, the construction for renovations and improvements required under the Master Contract was incomplete.
It is the practice of the tax assessor to assess new construction (incomplete as of the date of assessment) based on a percentage of completion. With respect to the December 31, 2008, assessment, the construction was complete and therefore no partial completion factor had to be considered in that assessment.
On September 18, 2001, the Town's Zoning Ordinance was amended to establish three defined areas within the subject property, thus, dividing the property into 3 concentric rings. Under the ordinance, the "center ring" or "C" area so-called, is the land where the gaming facilities are located. This is the only area on the property where gaming is allowed. The second ring, or "B" area so-called, primarily allows surface parking. The third ring, or "A" area so-called, creates a buffer zone wherein future development is not allowed.
The first element of the December 31, 2006, appraisal of the property was that of the land "as if unimproved," that is, the raw land valuation. Thus, the value of the land was determined "as if unimproved." The Town assessed the land to be worth a total of $20,031,900 for both tax years (2006 and 2008 Property Report Cards). The taxpayer believes the Town's assessment does not reflect the fair market value of the land. Its expert, Mr. Houle, concluded that the land "as unimproved" was worth only $3,000,000.
Both the tax assessor (Ms. Mandillo) and Mr. Dupuis testified to the methodology used to ascertain the land value portion of the assessment. Ms. Mandillo testified that a per-acre value was determined for three areas within the subject property. Mr. Dupuis testified that the per-acre *Page 13 
values for each area differed depending on the uses that were appropriate for each of the three areas. However, inexplicably the areas chosen for valuation purposes were not coextensive with the three rings identified by the 2001 zoning amendments. Mr. Dupuis attributed a value of $350,000 per acre to what he characterized as the "primary site" (approximately fifty acres), which he believed was necessary to support the existing gaming facility, and multiplied the figure by 0.8 due to the size of the site.[6] This area was different from the "C" area as depicted in the 1991 zoning amendments. The second area, also approximately fifty acres in size, was unimproved land that was deemed suitable for future commercial development. Since the economic potential for that acreage had not yet been realized, he attributed a $100,000 per-acre value to that portion of land. Finally, Mr. Dupuis appraised the remaining approximately sixty-one acres, which he designated as a "buffer zone," at a value of $20,000 per acre. Mr. Dupuis opined that this buffer area could be used for general recreation uses as allowed in a C-2 zone (such as a golf course or RV site).
Mr. Dupuis, testifying on behalf of the Town, stated that he implemented a mass appraisal method to value the land. Accordingly, he determined the per-acre value of the raw land as follows: (1) Although the land actually is improved, his analysis appraised the land as vacant, but with all rights that existed for potential future use in a CR-2 zone; (2) "Gaming" is a legally permitted use in a portion of the subject land in this CR-2 zone; (3) Since he believed no comparable land was available within the Town or nearby vicinity to value the land based on comparable sales of vacant land on which gaming was allowed, he departed from a comparable sales approach and he attempted to consider a range of values for all commercial properties located in Lincoln (not just CR-2 zones); (4) He then ranked the subject property against peracre *Page 14 
rates for other commercial land in the Town even though only some of those properties would have allowed the same permitted uses as in a CR-2 zone, but none of them would have allowed gaming.
Having established a range of values for other commercial land in the Town, he then ranked the property with respect to the previously described three separate tiers within the range and determined and opined that the subject land fell somewhere "in the middle of the range" when compared to commercial properties in his data base. The data base Mr. Dupuis used consisted of sales of commercial land within the Town, and also within in the States of Rhode Island, Connecticut, and Massachusetts. Neither Mr. Dupuis nor Ms. Mandillo were clear as to how or why they rated the subject property at the mid-range of the commercial land data base to arrive at the per-acre values for each of the constituent areas used in the assessment.[7]
Based on Mr. Dupuis' testimony, the Court has reservations as to whether the methodology employed by the Town established that its assessment of the unimproved land was made at its full and fair cash value.[8] For instance, the Town's methodology departed from the basic tenets of the comparable sales method, as defined inSweet, 844 A.2d at 98. The assessment did not consider the limitations on the use of the subject land for gaming and related activities; instead it merely compared the subject property with all other commercial property. Thus, neither Ms. Mandillo nor Mr. Dupuis took into consideration the relatively limited uses for the subject land, as dictated by the CR-2 zone and the 2001 zoning amendments, as well as further limitations as dictated by the Master Contract. *Page 15 
These restrictions would appear to make the comparison of the Twin Rivers land with other general commercial property somewhat unreliable. However, the burden falls on the taxpayer to present credible evidence of fair market value in order to overturn the Town's assessment. See Harvard Pilgrim Health Care ofNew England, Inc., 865 A.2d at 1035. Since the Court questions the accuracy of the procedure used by the assessor to establish the fair market value of the land at $20,031,190 as of December 31, 2006, it now must consider the validity of the taxpayer's expert testimony with respect to his opinion of land value if it is to overturn the Town's assessment of the land as unimproved. See id. (stating that the burden shifts to "the taxpayer to present evidence of fair market value").See id. (further holding that tax assessors are entitled to a presumption that they have performed their act properly until the contrary is proven).
Mr. Houle testified on behalf of UTGR that he attempted to attach appraised values to the land as if unimproved, irrespective of any previous appraisals and irrespective of the value attributed to other commercial parcels of land in the Town. Mr. Houle testified that he located comparable properties which allowed VLT gaming. Since only one other such property exists in Rhode Island, Mr. Houle additionally looked to properties in other states. Thus, he reviewed recent real estate sales data of sites that allegedly were comparable and devoted to similar gaming operations.
Mr. Houle then reviewed the total acreage at those sites and adjusted for differences in uses permitted between the allegedly comparable properties and the subject land. Two locations in Pennsylvania were chosen for comparison, one in Bethlehem where a casino was built on land zoned "industrial" at the site of a former steel mill. He admitted to overwhelming differences between the Bethlehem land and that of the subject site, and he generally rated the Bethlehem *Page 16 
land as "far superior," primarily because the applicable zoning there permitted uses broader than that at Twin River, such as industrial uses.[9] To establish the per-acre value of the Bethlehem site, Mr. Houle looked at the recent purchase price for the 124 acres at the Bethlehem site, determined a per-acre value, and then adjusted downward due to the broader array of potential uses available to a developer at the Bethlehem land as compared to the Twin River site.
Mr. Houle then compared a site in Perryville, PA (halfway between Baltimore and Philadelphia), consisting of two parcels totaling 37 acres which had a recent sales value of $14.5 million. Mr. Houle also characterized the Perryville land as "far superior" to the subject site, in that the Perryville property had what he described as "floating zones," supporting gaming as well as a hotel, and two shopping centers. Therefore, he opined that the Perryville land was more valuable for future development than the subject property.
Finally, he chose land in downtown Baltimore as comparable to the subject site because it allowed VLT gaming and, in addition, parking, hotels and shopping centers. The property was located close to the football and baseball stadiums (currently used by the Ravens and Orioles, respectively). The reason he considered the Baltimore land as "comparable" is because it supported uses and operations similar to Twin River. However, Twin River is in a CR-2 zone and is further restricted by state licensure, allowing only limited gaming uses in a portion of the land as compared to the Baltimore land. Another distinction between the Baltimore land and the subject was that all of the Baltimore land could be used for gaming as compared to Twin River, where only the "C" ring under the 2001 zoning amendments was available for gaming, with the remaining land areas allowing only parking and a buffer zone. *Page 17 
Mr. Houle described the subject property as having a "unique set" of legal restrictions. Therefore, the Baltimore property was considered more valuable than the land at the Twin River site. He, therefore, adjusted the Baltimore land value downward. Using the three out-of-state properties as comparables, Mr. Houle gave his opinion that the total land value for the subject property, as if unimproved, was $3 million rather than in excess of $20 million, as the Town used in its year-end 2006 assessment.
When questioned as why he chose out-of-state land for his comparable land sales, Mr. Houle credibly explained that he had to expand the universe of property sales to find comparable property that would be available to developers for gaming and related uses. He testified that he generally reported and adjusted for a difference between "destination" casinos, and "racinos" (or limited slot parlors) such as Twin River. A destination casino is a property which attracts the public as a travel destination (due in part to resort type amenities); whereas a "racino" or VLT casino attracts mostly local patrons interested only in VLT gaming offerings, together with some limited food, drink, and entertainment offerings.
Finally, Mr. Houle looked to property sold in Newport and used for the Newport Grand Casino, which contains 24 acres zoned C-1, and as such it does not have the same CR-2 restrictions that exist at the Twin River site. Newport was also considered a superior site because of fewer restrictions on use as compared to Twin River. In other words, a hypothetical casino operator or developer would pay less for the subject property than the comparable land in Newport due primarily to its more restrictive uses. Accordingly, Mr. Houle had to adjust the $9.9 million land sale in Newport downward to compare to the subject land.
Mr. Houle's opinion appeared subjective in terms of the manner by which he accounted for differences in the subject property and the comparable properties. Unlike Mr. Dupuis, *Page 18 
however, Mr. Houle did not compare the Twin River land only to other commercial land in the Town of Lincoln, but factored into his opinion the unique set of rights and restrictions which constrains the future development of the subject land. In Mr. Houle's analysis, the primary objective was to look at the unique characteristics of the Twin River land rather than having as his primary objective, equalizing land values with other commercial land situated in Lincoln. Equalization appeared to be the overriding goal of the Town appraiser rather than individualizing a fair market value based on the unusual characteristics of the subject property. However, the credibility of Mr. Houle's analysis of value was affected by his failure to look at the values of any commercial land in Lincoln, as well as his choice of "comparable sales" of destination casinos from other states.
The Court is not convinced that Mr. Houle's comparable sales analysis was entirely credible. The other properties were more typical of destination casinos, rather than racinos and he did not adjust for comparable market conditions in the different markets. For instance, the Court believes prime real estate in downtown Baltimore would be substantially more valuable than similar acreage available for similar uses located in Lincoln, Rhode Island.
Consequently, the Court finds Mr. Houle's use of comparisons to determine value of the unimproved land less credible than Mr. Dupuis' (and the Town's) comparison to the array ofall commercial properties in Lincoln or neighboring states. The Court recognizes that paramount in the Town's analysis was the goal of equalizing the assessments for all commercial land in Lincoln.[10] However, the better practice would be for the Town to consider the individualized nature of the property as permitting gaming use, and as limiting the potential market for the *Page 19 
subject land. While it would have been better for the Town to factor this into its analysis, the Court cannot conclude that Mr. Houle's valuation was more accurate. Consequently, the Court concludes the taxpayer has not carried its burden of proving the proper valuation of the raw land was $3 million.[11] An additional factor in questioning the credibility of Mr. Houle's opinion on the value of the land as unimproved is evident by the fact that the Perryville land (described as a more favorable property) and containing far less acreage sold recently for $14.5 million, suggesting that his opinion of land value of the subject property at $3 million was far less than its fair market value, even accepting the validity of the Perryville land as comparable. As a result, the Town's $20,031,900 valuation of the land as if unimproved must stand as the Court is obligated to accept the Town's presumptively correct assessment where the taxpayer failed to meet its burden of establishing an accurate fair market value for the land.See Harvard Pilgrim Health Care of New England, Inc.,865 A.2d at 1035 (observing that burden of proving fair market value shifts to taxpayer).
Neither witness testified that their respective opinions of the land value portion of the assessment was materially different at December 31, 2008. It is the different building values on those two dates which account for the difference between the December 31, 2006, and December 31, 2008, assessments. The Court now will address the valuation of the improvements.
 V Assessment of Value of Improvements
To arrive at a proper assessment, both UTGR and the Town agree that to the value of the unimproved land must be added the full and fair cash value of the improvements thereon, both for the assessment as of December 31, 2006, and December 31, 2008. The Town and UTGR also agree that the proper method of valuing the improvements such as the subject is to employ *Page 20 
the "Replacement Cost Method."[12] However, the experts for the Town and the taxpayer differ in the application of that methodology.
Essentially, the Replacement Cost Method requires that the assessed value be calculated on the cost of constructing a building designed to perform the same uses, adjusted for both functional and physical obsolescence.[13] Both experts agree that the cost per square foot of reconstructing such a building is derived from a cost guide referred to as "Marshall and Swift." Mr. Dupuis testified that he looked at the square footage of the existing building and then made adjustments for functional and physical obsolescence. Thus, he calculated the cost of reproducing the exact same building as it currently exists on the site, and then made adjustments to that figure.
Rather than starting at reproduction cost, Mr. Houle accounted for functional obsolescence by choosing the cost of reconstruction of a building having the same functional utility as the existing building. If that is done, according to Mr. Houle, there need not be a further reduction for the "functional obsolescence" factor (since functional obsolescence is "built into" the hypothetical building having the same functional utility as the existing building). Accordingly, Mr. Houle attempted to determine the reconstruction cost of a functionally *Page 21 
equivalent structure[14] thereby eliminating the need for an arbitrary functional obsolescence reduction. The Town, on the other hand, had its consultant expert determine the cost of reproducing the identical building as currently exists on site, and then applying a 10% reduction for physical depreciation and a 20% reduction for "functional obsolescence." UTGR, on the other hand, applied a cost per square foot to the construction of a smaller hypothetical building having the same "functional utility" as existing. In valuing the improvements, a major difference between the Town and UTGR was the method by which an adjustment for functional obsolescence was determined.
The Town calculated the cost to build the exact same building as existed on December 31, 2006, and used the Marshall and Swift Cost Guide to calculate the cost per square foot of reproducing the identical building. UTGR, on the other hand, believes that the Town misapplied the Replacement Cost Methodology by not calculating the cost of re-building a functionally equivalent structure that would be smaller and provide a more efficient use of space. The taxpayer suggests, therefore, that the Town failed to adjust accurately for functional obsolescence. Although the Town's assessment of the value of the improvements is derived from calculating the cost of reproduction of the existing building on the site, the Town recognized that adjustments had to be made.
However, in the opinion of the Court, the Town did not adjust in a clear or comprehensible manner for the fact that some portions of the existing buildings were no longer used functionally, thereby inaccurately inflating the building assessment. For instance, the existing casino building contained a three-story concrete grandstand originally used for *Page 22 
thoroughbred racing. By December 31, 2006, however, thoroughbred racing had been discontinued at Twin River, yet the Town's reproduction cost did not account for that functional obsolescence. Instead, it calculated the cost of reproducing that grandstand as part of the cost method of value. See
n. 11, supra.
UTGR's expert, on the other hand, calculated the cost of reconstructing a building that was the functional equivalent, but not the mirror image, of that which existed as of December 31, 2006. By doing so, UTGR's calculation more accurately accounted for functional obsolescence. For instance, by eliminating reconstruction of the concrete grandstand, Mr. Houle determined that a building having the same functional utility as dictated by the circumstances as they existed at year end 2006 would be a building having a total area of 353,000 square feet. Mr. Houle arrived at his opinion of functional space by gathering actual data to compute the functional area necessary. For instance, he eliminated a food court on the first floor that the Twin River manager testified was closed as of year end 2006. The concrete grandstand area used previously in connection with thoroughbred racing was eliminated. Mr. Houle visited other casinos with VLT gaming and determined that on average only thirty square feet of floor space was needed per machine. Therefore, Houle reduced the area functionally necessary for VLT gaming. He reduced the "back of the house" (administrative space) by 25% based on discussions with management at Twin River.
On balance, Houle's testimony was more credible as to his calculation of the functional space required for the operation of the facility. Furthermore, his determination as to the amount of square footage the market would pay for in purchasing building space within which to operate a similar casino was derived, in part, through field work that he thoroughly conducted. His opinion is that the existing space is more than that which a reasonable buyer would calculate as *Page 23 
necessary to operate a gaming facility such as Twin River, while still generating the same amount of gross revenues.
The Town, on the other hand, applied cost data to a building with a total area of about 490,000 square feet. In addition, because renovation and reconstruction was ongoing as of December 31, 2006, as required by the Master Contract, the Town overestimated the percentage of completion resulting in an inflated value as of that date. The Town considered the reconstruction and renovation as 80% complete as of December 31, 2006, and therefore, reduced by 20% the reproduction cost calculation to determine building value. However, to calculate the percentage completion as of December 31, 2006, the Town simply conducted a site visit or visible inspection, but without further investigation. Apparently, both Ms. Mandillo and Mr. Dupuis were present for this physical inspection, yet no reasonably contemporaneous notes or work papers have been presented for this Court to understand how the Town concluded that reconstruction was 80% complete as of December 31, 2006. Based upon the evidence, the Town's conclusion as to the percentage of completion as of year end 2006 was simply not credible.
On the other hand, UTGR believes, and the Court accepts, as a more credible and more objectively calculated analysis of the amount of completion as being about 60%. Therefore, the Town's assessment was high by at least a factor of 20%[15] for year end 2006. To prove its estimate of percentage of completion, UTGR looked to actual construction records showing that of the 508,349 square feet of floor space under renovation; only 290,000 square feet had been completed by December 31, 2006, which would calculate as 54% complete. UTGR also points *Page 24 
to other objective evidence that construction could not have been more than 60% complete as of the date of assessment, thereby concluding that the Town's factor for amount of completed renovations based on 80% completion was inaccurate, and 60% was a more accurate estimate of completed work. Based on 80% complete, the Town reduced its cost calculation by 20% and also subtracted depreciation to arrive at a building value. Based on the record and the credible evidence, however, the Court concludes that the renovations were no more than 60% complete as of December 31, 2006.
Furthermore, the Town's "visual inspection" approach failed to take into account that a great number of building permits were taken out after December 31, 2006, for purposes of completing the project; that a large auditorium consisting of some 30,000 square feet of floor space was not completed by the end of 2006; that the gaming area itself was not renovated until after 2006. Finally, UTGR points to some restaurant space that was incomplete as of December 31, 2006, and the entire third floor was incomplete as of year end 2006. The assessment, therefore, on the basis of the amount of completion alone, should have been calculated at a 40% reduction to replacement cost, rather than the 20% decrease in building value that the Town employed.
In addition, UTGR believes that the Town's opinion of value was overstated, in that the reconstruction cost should have been calculated on a hypothetical building consisting of only 353,000 square feet of functional space, rather than the Town calculating cost of reproducing almost the identical building at 490,000 square feet, a substantial reduction to fair market value would have been realized. Since the Marshall and Swift cost of construction figures are premised upon cost per square foot, the elimination of approximately 136,000 square feet for a *Page 25 
building having the same functional utility as the existing building would have a significant downward impact on the Town's assessment.
Considering additional factors that go into calculating the cost per square foot, UTGR utilized the Marshall and Swift Cost Guide in the category of "Grade C casino" to reduce the square foot cost of $150 per square foot (used by the Town) to $146 per square foot (used in UTGR's calculations). The Court finds that the cost per square foot utilized by UTGR to be a more accurate figure. Accordingly, the Court finds the taxpayer's calculations and analysis of building value premised upon a reasonable calculation of the space necessary for functional utility to be more reliable and probative of the functional obsolescence factor than the method used by the Town. The Court further finds UTGR's calculation of percentage of construction completed as of December 31, 2006, to be more reliable than the Town's. Finally, the Court finds that the taxpayer's use of the per-square-foot costs and its expert's use of the Marshall and Swift Cost Guide to be a more accurate reflection of cost than that used by the Town. Furthermore, UTGR's expert, Mr. Houle, added an additional dimension to the credibility of his opinion of building value based on the cost method by testing the value outcome using the income method of real estate valuation.[16]
The income method of valuation, as applied by Mr. Houle, was an effort to view potential rental income as a basis for valuation of the building rather than the cost of reproduction. The income approach to value is designed to determine values as the present worth of future benefits of owning a property. In other words, the income approach looks to the income potential from the property in the eyes of a future buyer/investor. *Page 26 
To determine value using this method, Mr. Houle first determined the income stream actually generated by Twin River as of year end 2006, and he then projected the revenue stream forward to 2008 and 2009. From this gross revenue stream, Mr. Houle deducted the expenses related to realizing the income stream. For this model the owner of the building and the operator of the business are projected to be separate entities. Mr. Houle then investigated the relationship between gross revenues and a fair rent based upon a percentage of the gross rental stream. His investigation determined a fair rental figure to be 3% of gross revenue. This was the percentage used in renting a casino to an operator in Baltimore. The City in that case owned the building and rented it to a casino operator.
Mr. Houle then had to determine a fair capitalization rate to project the value of the future income stream. For this Mr. Houle consulted Korpacz, which he testified was a reliable source. Based on this investigation, Mr. Houle believed a capitalization rate of about .073 would be appropriate in considering the market value of the Twin River property and factoring in the risk associated with operating a casino on the property. Mr. Houle did not choose the income approach as the best method of valuing the Twin River improvements, but at trial testified to the income method only to test his opinion of value derived under the cost approach. Under the income approach, Houle, on behalf of the taxpayer, testified to his final opinion of the value of the improvements at Twin River. Using the income approach he arrived at an opinion of fair market value at $59 million, which tested favorably with his opinion of value under the reconstruction cost method, resulting in an opinion of a value of $52 million for December 31, 2008.
On balance, therefore, the Court believes the taxpayer's calculation of the value of the improvements as more indicative of full and fair value than the value assessed by the Town. *Page 27 
However, the Court believes the Town's assessment of the value of the land, "as unimproved," must stand because UTGR failed to adequately prove that the Town's figure of approximately $20 million was incorrect and that its alternative figure of $3 million for the value of the land was accurate.
 VI Conclusion
The Court believes the taxpayer has not sustained its burden with respect to the value of the land, but has met its burden with respect to the value of the building/improvements. Therefore, the Town's previous assessments should not stand as the appropriate assessment of the full and fair market value of the subject property, and must be adjusted in accordance with this conclusion.
As to the building (improvements) portion, the Court concludes that the taxpayer has met its burden of establishing that on December 31, 2008, the improvements should have been valued at $52 million. The Court further concludes that the improvements should have been assessed at a value of $30 million for December 31, 2006. To these respective findings, the Court must add the Town's assessed land value at $20,031,900. It is the Court's opinion, therefore, that the more credible evidence concerning value of the improvements, demonstrates that the total assessed value determined by the Town on the property card as of December 31, 2006, ($94,739,200) did not represent the full and fair value of the real property as of that date, and should have been $50,031,900. Similarly, the Court finds that the total assessed value determined by the Town on the property card as of December 31, 2008, ($113,327,200), should have been a total of $72,031,900. Accordingly, since UTGR has paid the 2007 and 2009 property taxes based on what the Court concludes were inaccurate assessments, the Town must pay a tax rebate to UTGR *Page 28 
equal to the difference between the taxes calculated on the Town's assessment and taxes calculated upon the Court's valuations as set forth above. The Court will await a form of judgment calculated by the parties in accordance with this Decision in order to quantify the amount of abatement required.
[1] Assessment made as of December 31 of any year governs the tax to be paid during the subsequent tax year; therefore, the December 31, 2006 assessment governs the tax to be levied by the Town for the 2007 tax year. Likewise, the December 31, 2008 assessment governs the tax to be levied by the Town for the 2009 tax year. For continuity of reference, the Court will refer to the assessment dates rather than the tax year.
[2] In accordance with a State law enacted in 1997, each municipality is required to conduct a complete town-wide re-evaluation of real property every nine (9) years and an update every three (3) years thereafter. See
G.L. 1956 § 44-5-11.5(4).
[3] Specifically, § 44-5-27 provides:
 "The remedy provided in § 44-5-26 is exclusive if the taxpayer owned or possessed any ratable estate at all, except that, in a proper case, the taxpayer may invoke the equity jurisdiction of the superior court; provided, that the complaint is filed within three (3) months after the last day appointed for the payment, without penalty, of the tax, or the first installment of the tax, if it is payable in installments. A taxpayer alleging an illegal or void tax assessment against him or her is confined to the remedies provided by § 44-5-26, except that the taxpayer is not required to file an appeal with the local assessor." (Emphases added.)
[4] In addition, Mr. DuPuis previously served as the Lincoln Tax Assessor from 1992-1999. His company, in fact, was hired by the Town to conduct the Town's assessments for December 31, 2006 and December 31, 2008. For that reason, his testimony as an expert cannot be considered that of an "independent expert." Furthermore, the credibility of his opinions may be affected by his contractual relationship with the Town.
[5] The "replacement cost" is the cost of replacing a structure or improvement with a similar structure or improvement made with new materials. Once this figure is calculated, any estimated accrued depreciation is deducted, and the estimated value of the land is added. The result is the valuation of property by means of the replacement-cost-minus-depreciation method. FerlandCorp. v. Bouchard 626 A.2d 210, 212 n. 3 (R.I. 1993).
[6] The second area had a multiplier of 1.0, and the third site had a multiplier of 0.85 also on account of the sizes of the tracts.
[7] There was testimony that Mr. DuPuis referred to a sales data base known as the Warren Group, for sales of property going back to 1987 in Rhode Island, Massachusetts and Connecticut. It is not clear how the Warren Group data base was used to calculate per-acre values of the subject land. Clearly, the data base included sales of commercial land outside of Lincoln and not necessarily similar in use or restrictions as the subject land.
[8] It is not clear why Mr. Dupuis valued the land in three portions (primary, future development and buffer). Furthermore, the calculation did not consider the uses permitted in the concentric rings as set forth in the 2001 zoning amendments.
[9] Because continued use of any property for gaming purposes is often determined by unpredictable political factors, developers contemplating a purchase of land to be used for gaming must consider other possible uses in the event that gaming is prohibited some time in the future.
[10] The Court recognizes that it is the intention of the General Assembly "that all taxpayers in Rhode Island are treated equitably." Section 44-5-11.5(3). However, using the equalization method to compare Twin River with all other commercial properties when the subject property was so unique, does not appear to have achieved the goal of the equitable treatment of all taxpayers in the Town.
[11] The Court observes that in 2003, the land was valued at $10,000,000 for tax purposes.
[12] The goal of the assessment is to reach a conclusion of fair market value. As to the improvements, the theory of the cost method is that a willing buyer would only pay to a willing seller a certain amount for the building currently on the land. This method adjusts for functional obsolescence, thereby taking into account that a willing buyer would not pay any more for the existing building than it would cost to erect a similar building necessary to perform the same functions and thus, to derive the same income as the current building. In other words, the buyer would be unwilling to pay a premium for a building that contained wasted space, or unused, useless space.
[13] The method of replicating the reconstruction of an existing building is referred to as the "reproduction cost method." The goal of the assessment is to reach a conclusion of fair market value. As to the improvements, the theory of the cost method is that a willing buyer would only pay to a willing seller a certain amount for the building currently on the land. This method adjusts for functional obsolescence, thereby taking into account that a willing buyer would not pay any more for the existing building than it would for the cost to erect a similar building necessary to perform the same functions and, thus, to derive the same income as the current building. In other words, the buyer would be unwilling to pay for a building that contained wasted space or unused, useless space.
[14] In considering the square feet necessary to achieve the same functional utility, Mr. Houle reviewed the functional space necessary for each component of functional utility (gaming; food and beverage; entertainment). For instance, he examined square footage at other casinos for each component as compared to Twin River, and, in addition, he completely eliminated the space in the current building that provides a three-story concrete grandstand which is no longer functionally necessary for the casino purposes currently at Twin River.
[15] The Town equated functional obsolescence with the percentage of completed construction. UTGR's expert, on the other hand, calculated functional obsolescence as a factor in determining how many square feet of building area was necessary to realize the same functional uses (and derive the same income), and separately calculated percentage of completion as a reduction to building value.
[16] Often, real estate appraisers will calculate an opinion of value using one appraisal method, and test the validity of their value opinion by also using a different appraisal method. *Page 1